## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MICHAEL MATANKY, CHARLES FRANKLIN, MICHAEL DUFRESNE, DWAYNE GRANT, JAMES ZACHACZ, DAVID LINDERMAN, STEVEN CLOSSER, JAMES DIIORIO, JOHN BLEICH, BRIAN NAKEL, JOHN HEROLD, and JEDEDIAH BLANKS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL MOTORS LLC, <br><br> Defendant. | Case No. 2:18-cv-10601 <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................... 1

II.   JURISDICTION .................................................................... 4

III.  VENUE ................................................................................ 5

IV.   PARTIES ............................................................................. 5

    A.    Plaintiffs ................................................................... 5

        1.    Colorado Plaintiff ............................................ 5

        2.    Connecticut Plaintiffs ...................................... 8

            a.    Charles Franklin ................................... 8

            b.    Michael Dufresne ................................ 10

        3.    Georgia Plaintiff ............................................ 12

        4.    Kansas Plaintiff .............................................. 14

        5.    Michigan Plaintiff .......................................... 16

        6.    Missouri Plaintiff ........................................... 19

        7.    Nevada Plaintiff ............................................. 21

        8.    Ohio Plaintiff ................................................. 24

        9.    Pennsylvania Plaintiff .................................... 27

        10.   South Carolina ............................................... 29

        11.   Texas Plaintiff ............................................... 30

    B.    Defendant ................................................................ 32

V.    FACTUAL ALLEGATIONS ................................................ 33

    A.    Track enthusiasts share a passion for racing their vehicles on
        closed tracks. ........................................................... 33

010687-11 1014581 V1

B.    Specialized race tracks create safe conditions for track enthusiasts to pursue their passion. ................................................... 33

C.    "Track-proven" vehicles operate under extreme conditions and must meet certain basic safety features to operate on a race track. ...................................................................................................... 34

      1.    Transmission systems in "track-proven" vehicles ................. 35

      2.    Differentials in "track-proven" vehicles ................................ 35

D.    The Corvette Z06 was marketed as if it could operate on race tracks because GM knew this was material to potential buyers. ...... 36

      1.    The product information materials promoted track use. ......... 36

      2.    The features on the Z06 are those one would expect in a track-ready car ......................................................................... 39

      3.    The Z06 Owner's Manual contemplates track use. ............... 40

      4.    Press kits were created by GM to entice track enthusiasts to purchase a Z06 .................................................................. 44

      5.    GM sponsored track events to demonstrate the "track-readiness" of the Z06. ............................................................ 46

E.    The Corvette Z06 cannot be safely raced on the track due to design and manufacturing defects in the cooling system. ................. 46

      1.    The nature of the defects and their safety consequences ........ 46

      2.    The economic consequences associated with the defects ....... 48

F.    GM was aware of the defects in the 2015–2016 Corvette Z06 while marketing them as "track-proven." ......................................... 49

      1.    GM concealed the fact that the Z06 was not fit for the track. ...................................................................................... 49

      2.    GM admits that the Z06's cooling system was defective. ...... 50

      3.    GM had knowledge of the defect from consumer complaints. ............................................................................. 50

- ii -

G.    Despite express warranties, GM has not fixed the problems with the "track-proven" powertrain system. ..................................... 56

VI.    CLASS ALLEGATIONS ................................................................ 59

VII.    CLAIMS FOR RELIEF .............................................................. 64

A.    Claims Brought on Behalf of the Nationwide Class ........................ 64

COUNT ONE VIOLATION OF MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301 *ET SEQ.*) .......................................................... 64

B.    Claims Brought on Behalf of the Colorado Class by Plaintiff Matanky ........................................................................ 67

COUNT TWO VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT (COLO. REV. STAT. § 6-1-101 *ET SEQ.*) .............. 67

COUNT THREE FRAUDULENT CONCEALMENT (BASED ON COLORADO LAW) .............................................................. 69

COUNT FOUR BREACH OF EXPRESS WARRANTY (COLO. REV. STAT. § 4-2-313 and § 4-2.5-210) .............................................. 74

COUNT FIVE BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (COL. REV. STAT. §§ 4-2-313 AND 4-2.5-212) ...................................................................... 77

COUNT SIX UNJUST ENRICHMENT (BASED ON COLORADO LAW) ...... 79

C.    Claims Brought on Behalf of the Connecticut Class by Plaintiffs Franklin and Dufresne ....................................... 80

COUNT SEVEN VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. § 42-110A *ET SEQ.*) ............................................................................ 80

COUNT EIGHT FRAUDULENT CONCEALMENT (BASED ON CONNECTICUT LAW) ........................................................ 81

COUNT NINE BREACH OF EXPRESS WARRANTY (CONN. GEN. STAT. ANN § 42A-2-313) .......................................................... 86

- iii -

COUNT TEN BREACH OF IMPLIED WARRANTY OF
  MERCHANTABILITY (CONN. GEN. STAT. ANN. § 42A-2-314) ........ 90

COUNT ELEVEN UNJUST ENRICHMENT (BASED ON
  CONNECTICUT LAW) ............................................................................ 91

  D.   Claims Brought on Behalf of the Georgia Class by Plaintiff
       Grant .......................................................................................... 92

COUNT TWELVE VIOLATION OF THE GEORGIA FAIR BUSINESS
  PRACTICES ACT (GA. CODE ANN. § 10-1-390 *ET SEQ.*) .................... 92

COUNT THIRTEEN VIOLATION OF THE GEORGIA UNIFORM
  DECEPTIVE TRADE PRACTICES ACT (GA. CODE ANN. § 10-1-
  370 *ET SEQ.*) ...................................................................................... 93

COUNT FOURTEEN FRAUDULENT CONCEALMENT (BASED ON
  GEORGIA LAW) .................................................................................... 94

COUNT FIFTEEN BREACH OF EXPRESS WARRANTY (GA. CODE
  ANN. §§ 11-2-313 AND 11-2A-210) ........................................................ 99

COUNT SIXTEEN BREACH OF IMPLIED WARRANTY OF
  MERCHANTABILITY (GA. CODE. ANN. §§ 11-2-314 AND 11-
  2A-212) ............................................................................................ 103

COUNT SEVENTEEN UNJUST ENRICHMENT (BASED ON GEORGIA
  LAW) ................................................................................................ 105

  E.   Claims Brought on Behalf of the Kansas Class by Plaintiff
       Zachacz ...................................................................................... 106

COUNT EIGHTEEN VIOLATION OF THE KANSAS CONSUMER
  PROTECTION ACT (KAN. STAT. ANN. § 50-623 *ET SEQ.*) .............. 106

COUNT NINETEEN FRAUDULENT CONCEALMENT (BASED ON
  KANSAS LAW) .................................................................................... 107

COUNT TWENTY BREACH OF EXPRESS WARRANTY (KAN. STAT.
  ANN. §§ 84-2-314 AND 84-2A-210) ...................................................... 112

COUNT TWENTY-ONE BREACH OF IMPLIED WARRANTY OF
  MERCHANTABILITY (KAN. STAT. §§ 84-2-314 AND 84-2A-212) .. 116

010687-11 1014581 V1

COUNT TWENTY-TWO UNJUST ENRICHMENT (BASED ON
KANSAS LAW) ................................................................................. 117

    F.    Claims Brought on Behalf of the Michigan Class by Plaintiff
Linderman ......................................................................... 118

COUNT TWENTY-THREE VIOLATION OF THE MICHIGAN
CONSUMER PROTECTION ACT (MICH. COMP. LAWS
§ 445.903 *ET SEQ.*) ......................................................................... 118

COUNT TWENTY-FOUR FRAUDULENT CONCEALMENT (BASED
ON MICHIGAN LAW) ...................................................................... 120

COUNT TWENTY-FIVE BREACH OF EXPRESS WARRANTY (MICH.
COMP. LAWS  §§ 440.2313 AND 440.2860) ......................................... 125

COUNT TWENTY-SIX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (MICH. COMP. LAWS §§ 440.2314 AND
440.2860) ........................................................................................ 129

COUNT TWENTY-SEVEN UNJUST ENRICHMENT (BASED ON
MICHIGAN LAW) ............................................................................ 131

    G.    Claims Brought on Behalf of the Missouri Class by Plaintiff
Closser ............................................................................... 132

COUNT TWENTY-EIGHT VIOLATION OF THE MISSOURI
MERCHANDISING PRACTICES ACT (MO. REV. STAT.
§ 407.010 *ET SEQ.*) ......................................................................... 132

COUNT TWENTY-NINE FRAUDULENT CONCEALMENT (BASED
ON MISSOURI LAW) ........................................................................ 133

COUNT THIRTY BREACH OF EXPRESS WARRANTY (MO. REV.
STAT. §§ 400.2-313 AND 400.2A-210) .................................................. 138

COUNT THIRTY-ONE BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (MO. REV. STAT. § 400.2-314) ........................ 141

COUNT THIRTY-TWO UNJUST ENRICHMENT (BASED ON
MISSOURI LAW) ............................................................................. 143

H.    Claims Brought on Behalf of the Nevada Class by Plaintiff DiIorio ...................................................................................... 144

COUNT THIRTY-THREE VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*) ........................................................................................... 144

COUNT THIRTY-FOUR FRAUDULENT CONCEALMENT (BASED ON NEVADA LAW) .................................................................... 145

COUNT THIRTY-FIVE BREACH OF EXPRESS WARRANTY (N.R.S. §§ 104.2313 AND 104A.2210) .................................................... 150

COUNT THIRTY-SIX BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.R.S. §§ 104.2314 AND 104A.2212) ............ 154

COUNT THIRTY-SEVEN UNJUST ENRICHMENT (BASED ON NEVADA LAW) .................................................................... 155

I.    Claims Brought on Behalf of the Ohio Class by Plaintiff Bleich ... 156

COUNT THIRTY-EIGHT VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT (MO. REV. STAT. § 1345.01 *ET SEQ.*) ..... 156

a.    *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382); .... 158

b.    *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123); ............................................................... 158

c.    *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025); .................. 158

d.    *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077); .......................................................................... 158

e.    *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388); ............................................................... 158

f.    *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347); ............................................................... 158

g. *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586); .......................................................... 158

h. *Brown v. Spears* (OPIF #10000403); ..................................... 158

i. *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427); .......................................................... 158

j. *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326); and ......................................... 158

k. *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524). .......................................................... 158

COUNT THIRTY-NINE FRAUDULENT CONCEALMENT (BASED ON OHIO LAW) ................................................................ 159

COUNT FORTY BREACH OF EXPRESS WARRANTY (OHIO REV. CODE ANN. § 1302.26, *et seq.*) (U.C.C. § 2-313) ................................... 164

COUNT FORTY-ONE BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (OHIO REV. CODE ANN. §§ 1302.27 AND 1310.19) ................................................................ 168

COUNT FORTY-TWO UNJUST ENRICHMENT (BASED ON OHIO LAW) ................................................................ 169

J. Claims Brought on Behalf of the Pennsylvania Class by Plaintiff Nakel ................................................................ 170

COUNT FORTY-THREE VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 PA. CONS. STAT. § 201-1 *ET SEQ.*) ..................................... 170

COUNT FORTY-FOUR FRAUDULENT CONCEALMENT (BASED ON PENNSYLVANIA LAW) ................................................. 174

COUNT FORTY-FIVE BREACH OF EXPRESS WARRANTY (13 PA. CONS. STAT. § 2313) ................................................. 179

COUNT FORTY-SIX BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (13 PA. CONS. STAT. §§ 2314 AND 2A212) ................................................................ 183

- vii -

COUNT FORTY-SEVEN UNJUST ENRICHMENT (BASED ON PENNSYLVANIA LAW)......................................................................... 184

    K.    Claims Brought on Behalf of the South Carolina Class by Plaintiff Herold........................................................................ 185

COUNT FORTY-EIGHT VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10 *ET SEQ.*) ........................................................................................ 185

COUNT FORTY-NINE FRAUDULENT CONCEALMENT (BASED ON SOUTH CAROLINA LAW)..................................................... 187

COUNT FIFTY BREACH OF EXPRESS WARRANTY (S.C. CODE ANN. §§ 36-2-313 AND 36-2A-210)..................................... 192

COUNT FIFTY-ONE BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (S.C. CODE §§ 36-2-314 AND 36-2A-212) ..... 196

COUNT FIFTY-TWO UNJUST ENRICHMENT (BASED ON SOUTH CAROLINA LAW) .................................................................. 197

    L.    Claims Brought on Behalf of the Texas Class by Plaintiff Blanks ................................................................................ 198

COUNT FIFTY-THREE VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE ANN. ANN. § 17.4 ET SEQ.).................. 198

COUNT FIFTY-FOUR FRAUD BY CONCEALMENT (BASED ON TEXAS LAW) ....................................................................... 199

COUNT FIFTY-FIVE BREACH OF EXPRESS WARRANTY (TEX. BUS & COM. CODE ANN. §2-313)................................................ 204

COUNT FIFTY-SIX BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (TEX. BUS. & COM. CODE §§ 2.314 AND 2A.212) ......................................................................................... 207

COUNT FIFTY-SEVEN UNJUST ENRICHMENT (BASED ON TEXAS LAW)............................................................................... 209

REQUEST FOR RELIEF ................................................................. 210

DEMAND FOR JURY TRIAL ...........................................................211

010687-11 1014581 V1

Plaintiffs Michael Matanky, Charles Franklin, Michael Dufresne, Dwayne Grant, James Zachacz, David Linderman, Steven Closser, James DiIorio, John Bleich, Brian Nakel, John Herold, and Jedediah Blanks (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), allege the following:

## I.     INTRODUCTION

1.     "**Track-Proven Structure and Technologies**." That is what General Motors told potential race-enthusiast customers to entice them to buy its 2015, 2016, and 2017 Corvette Z06. The Z06s were far from ready for the track, however; in fact, they proved to be unreliable there. When a Z06 driver takes their car to the track, he or she learns that after fifteen minutes or less, the Z06 overheats, often causing the car to go into "Limp Mode" at drastically reduced speed and power—an obviously dangerous event when surrounded by speeding cars. The Z06 overheats and goes into Limp Mode because, despite its claims that the Z06 is made for the track, GM chose to equip the Z06 with a defective cooling system. This defect manifests in the "track" car's inability to withstand the demands of race track driving.

2.     There are certain basic rules that all carmakers must follow. When a carmaker sells a car, it has a duty to ensure that the car functions properly and safely for its advertised use and is free from defects. When a carmaker discovers a

- 1 -

defect, it must disclose the defect and make it right or cease selling the car. And when a carmaker provides a warranty, it must stand by that warranty. This case arises from GM's breach of these rules. GM deceived its customers when it sold or leased the Z06s while promising that they were built for the track, when in fact they were unreliable and unsafe for that purpose.

3.      GM proclaimed that the Z06 had "track-proven structure and technologies" and explained how the Z06 was "conceived on the track":



CORVETTE Z06

A driver's car with no equal
Z06 is a true world-class supercar. Conceived on the track and engineered alongside the C7.R race car, Z06 features a lightweight and rigid aluminum space frame, as well as a supercharged 6.2L aluminum V8 engine delivering 650 horsepower and 650 lb.-ft. of torque.

STARTING AT:
$79,450*
AS SHOWN: $84,010*

4.      As GM intended, Plaintiffs purchased Z06s for road and track use at prices from $80,000 to $120,000. There are over 30,000 vehicles in the proposed Class. However, Z06s are not fit for track use due to an ineffective cooling system. This defect results in the powertrain overheating when used on the track,

- 2 -

sometimes sending the car into Limp Mode, which is a dangerous condition on a race track full of speeding cars. In addition to manifesting on the race track, the defect also activates the dangerous Limp Mode in non-track driving conditions.

5.      Customer experiences with the Z06 on the track differ dramatically from GM's promise of a track vehicle, and their testimonials chronicle the activation of Limp Mode or the driver having to pull off the track to let the engine cool down. Z06 forums and GM customer service files are replete with complaints from consumers who reasonably believed that their Z06 would in fact be fully track-capable—instead, they have been put at risk of accident on race tracks and during non-track driving when the defective transmissions and rear differentials overheat, causing the cars to go into Limp Mode at drastically reduced speed and performance or forcing the driver to stop in order to protect the engine.

6.      In addition, because the Z06 runs at such high temperatures, and particularly when it overheats, the engine is damaged due to warping from these high temperatures.

7.      GM is aware of the defect and suspended production of the Z06 for a period of time to find a solution to the overheating issue, which it intended to incorporate in the 2017 Z06. GM claimed to have fixed the problem in the 2017 model by switching to a new hood with larger vents and a new supercharger cover. However, this attempted fix does not help consumers with previous models and

- 3 -

does not fix the problem. The 2017 still overheats and GM's only answer is to, after the fact, warn owners that automatic transmissions have the potential for overheating.

8.      But GM cannot shift its warranty obligations onto its customers. If the Z06s need a different cooling system to actually perform as advertised, then GM should retrofit the cars with these components on its 2015 and 2016 models as well as fix the 2017 model to allow the car to perform as promised. Additionally, GM should address and remedy the problems to the engine, transmission, drivetrain, and other parts that occur as a result of these unintended overheating issues.

9.      Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of model year 2015–2017 Corvette Z06s. Plaintiffs seek damages and other equitable relief.

## II.   JURISDICTION

10.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

- 4 -

### III.   VENUE

11.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions and/or misrepresentations giving rise to Plaintiffs' claims occurred in this District. Plaintiff Michael Vazquez took delivery of his Z06 in this District and GM has marketed, advertised, sold, and leased Z06s within this District.

### IV.   PARTIES

**A.     Plaintiffs**

**1.     Colorado Plaintiff**

1.      Plaintiff Michael Matanky is an individual residing in Boulder, Colorado.  On September 13, 2015, Mr. Matanky purchased a new 2016 Chevrolet Corvette Z06 LT3 from Purifoy Chevrolet, an authorized GM dealership in Fort Luptin, Colorado, for approximately $106,000.  The vehicle is covered by a manufacturer's warranty.  Mr. Matanky purchased the vehicle for both road and track use.

2.      Mr. Matanky purchased and still owns this vehicle.  Unknown to Mr. Matanky at the time he purchased the vehicle, the Corvette Z06 suffered from defects.  GM knew about these defects but did not disclose the defects to Mr. Matanky, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable, that the vehicle was intended to be a vehicle

- 5 -

that could be used on the track or at high speeds, and that it was capable of safely performing these operations.

3.     Mr. Matanky selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced.  Mr. Matanky reviewed print and online advertisements showing photographs of the Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  Mr. Matanky also viewed an ad by GM showing that the 2016 Corvette Z06 is one of the best-designed vehicles to remove the heat generated during use. None of the information reviewed by Mr. Matanky contained any disclosure relating to any defects in the Corvette Z06 or indicating that the Corvette Z06 was unreliable and unsafe when used on the track.

4.     Mr. Matanky's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  If GM had disclosed to Mr. Matanky that his vehicle's cooling system suffered from

- 6 -

defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

5.    Matanky was driving his vehicle uphill in Boulder Canyon on a hot day in the summer of 2016 when the vehicle overheated and went into Limp Mode.  Even though purchased his 2016 Corvette Z06 for the track, Mr. Matanky has avoided taking it to the track because he is concerned about overheating.  Due to GM's failure to disclose the cooling defect, Mr. Matanky was denied the benefit of the bargain at the time of sale, and paid a premium for a vehicle that he would not have paid.  Mr. Matanky has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

6.    In January 2018, Mr. Matanky attended the Barrett Jackson classic car auto auction in Scottsdale, Arizona.  Chevrolet had a large exhibit of new cars.  Among them was the new Corvette ZR1.  Mr. Matanky observed the 2018 ZR1 with a Corvette body that appeared to have a completely redesigned front with several new large cutout openings and new large coolers mounted in the openings.  Mr. Matanky spoke with the Chevrolet representatives showing the new 2018 ZR1 and they readily admitted to Mr. Matanky that they wished they had more time to design the Corvette body so that the cooling issues with the original Corvette Z06s would not have occurred.  When Mr. Matanky told them he was unhappy

- 7 -

about the way his 2016 Corvette Z06 performs because of the cooling issues, they smiled and shrugged their shoulders

### 2. Connecticut Plaintiffs

#### a. Charles Franklin

7.     Plaintiff Charles Franklin is an individual residing in Scottsdale, Arizona.  On September 28, 2016, Mr. Franklin purchased a new 2016 Chevrolet Corvette Z06 3LT from Loehmann Blasius Chevrolet, an authorized GM dealership in Waterbury, Connecticut, for approximately $86,000.  The vehicle is covered by a manufacturer's warranty.  Mr. Franklin purchased the vehicle for both road and track use.

8.     Mr. Franklin purchased and still owns this vehicle.  Unknown to Mr. Franklin at the time he purchased the vehicle, the Corvette Z06 suffered from defects.  GM knew about these defects but did not disclose the defects to Mr. Franklin, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable, that the vehicle was intended to be a vehicle that could be used on the track or at high speeds, and that it was capable of safely performing these operations.

9.     Mr. Franklin selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced.  Mr. Franklin reviewed print and online

- 8 -

advertisements showing photographs of the Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  None of the information reviewed by Mr. Franklin contained any disclosure relating to any defects in the Corvette Z06 or indicating that the Corvette Z06 was unreliable and unsafe when used on the track.

10.    Mr. Franklin's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  If GM had disclosed to Mr. Franklin that his vehicle's cooling system suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

11.    Mr. Franklin's Corvette Z06 has overheated and gone into Limp Mode multiple times when tracking the vehicle.  It was good for three laps driving it hard at Inde Motorsports Ranch in Willcox, Arizona. Due to GM's failure to disclose the cooling defect, Mr. Franklin was denied the benefit of the bargain at the time of sale, and paid a premium for a vehicle that he would not have paid.  Mr.

- 9 -

Franklin has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

**b.    Michael Dufresne**

12.    Plaintiff Michael Dufresne is an individual residing in Sutton, Massachusetts.  On July 26, 2015, Mr. Dufresne purchased a new 2016 Chevrolet Corvette Z06 with the Z07 track package from Cargill Chevrolet, an authorized GM dealership in Putnam, Connecticut, for $110,315.38.  The vehicle is covered by a manufacturer's warranty.  Mr. Dufresne purchased the vehicle for both road and track use.

13.    Mr. Dufresne purchased and still owns this vehicle.  Unknown to Mr. Dufresne at the time he purchased the vehicle, the Corvette Z06 suffered from defects.  GM knew about these defects but did not disclose the defects to Mr. Dufresne, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable, that the vehicle was intended to be a vehicle that could be used on the track or at high speeds, and that it was capable of safely performing these operations.

14.    Mr. Dufresne selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced.  Mr. Dufresne reviewed print and online advertisements showing photographs of the Corvette Z06 on race tracks and read

- 10 -

about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App," a heads-up tachometer display used for racing, and built in lap timers with available software to analyze each track lap.  None of the information reviewed by Mr. Dufresne contained any disclosure relating to any defects in the Corvette Z06 or indicating that the Corvette Z06 was unreliable and unsafe when used on the track.

15.     Mr. Dufresne's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  If GM had disclosed to Mr. Dufresne that his vehicle's cooling system suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

16.     Mr. Dufresne purchased his 2016 Z06 to use on the track and on the road but the vehicle has overheated and gone into Limp Mode on multiple occasions on the track.  Mr. Dufresne was told by the dealership that there is nothing they can do about it.  Due to GM's failure to disclose the cooling defect, Mr. Dufresne was denied the benefit of the bargain at the time of sale, and paid a premium for a vehicle that he would not have purchased had he known about the

- 11 -

defects.  Mr. Dufresne has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

### 3.   Georgia Plaintiff

17.    Plaintiff Dwayne Grant is an individual residing in Suwanee, Georgia. On May 11, 2017, Mr. Grant purchased a used 2016 Chevrolet Corvette Z06 from Jimmy Britt Chevrolet, an authorized GM dealership in Greensboro, Georgia, for approximately $86,000.  The vehicle is covered by a manufacturer's warranty.  Mr. Grant purchased the vehicle for both road and track use.

18.    Mr. Grant purchased and still owns this vehicle.  Unknown to Mr. Grant at the time he purchased the vehicle, the Corvette Z06 suffered from defects. GM knew about these defects but did not disclose the defects to Mr. Grant, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable, that the vehicle was intended to be a vehicle that could be used on the track or at high speeds, and that it was capable of safely performing these operations.

19.    Mr. Grant selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced.  Mr. Grant reviewed print and online advertisements showing photographs of the Corvette Z06 on race tracks and read

about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  None of the information reviewed by Mr. Grant contained any disclosure relating to any defects in the Corvette Z06 or indicating that the Corvette Z06 was unreliable and unsafe when used on the track.

20.    Mr. Grant's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  If GM had disclosed to Mr. Grant that his vehicle's cooling system suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

21.    On June 14, 2017, Mr. Grant participated in a SCCA Track Night for the first time at Atlanta Motorsport Park.  On just the first non-paced session, the "engine overheated" warning light activated, and the car went into Limp Mode approximately 17 minutes into the 20-minute session.  Mr. Grant had to pull out of the racing line to let other drivers by and was fortunate to be able to get the car off the track before it caused an accident.  It is worth noting that no other car

- 13 -

overheated during this Track Night, including Mr. Grant's son's 2002 Corvette Z06 with technology that is nearly 14 years older than his Z06's.

22.     Given the safety issues associated with the 2016 Corvette Z06's defective cooling system, it is unlikely that Mr. Grant will take it to the track again. Due to GM's failure to disclose the cooling defect, Mr. Grant was denied the benefit of the bargain at the time of sale, and paid a premium for a vehicle that he would not have paid.  Mr. Grant has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

### 4.     Kansas Plaintiff

23.     Plaintiff James Zachacz is an individual residing in Stanley, Kansas. On December 30, 2015, Mr. Zachacz purchased a new 2016 Chevrolet Corvette Z06 LT-1from Hendrick Chevrolet, an authorized GM dealership in Overland Park, Kansas, for approximately $74,000.  The vehicle is covered by a manufacturer's warranty.  Mr. Zachacz purchased the vehicle for both road and track use.

24.     Mr. Zachacz purchased and still owns this vehicle.  Unknown to Mr. Zachacz at the time he purchased the vehicle, the Corvette Z06 suffered from defects.  GM knew about these defects but did not disclose the defects to Mr. Zachacz, so he purchased his vehicle on the reasonable but mistaken belief that his

- 14 -

vehicle would be safe and reliable, that the vehicle was intended to be a vehicle that could be used on the track or at high speeds, and that it was capable of safely performing these operations.

25.    Mr. Zachacz selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced.  Mr. Zachacz reviewed print and online advertisements showing photographs of the Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  None of the information reviewed by Mr. Zachacz contained any disclosure relating to any defects in the Corvette Z06 or indicating that the Corvette Z06 was unreliable and unsafe when used on the track.

26.    Mr. Zachacz's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  If GM had disclosed to Mr. Zachacz that his vehicle transmission suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

27.     On August 20, 2016, Mr. Zachacz's 2016 Corvette Z06 overheated and went into Limp Mode on the track at the Virginia International Raceway.  Mr. Zachacz tracked the vehicle on July 8, 2017, but had to shorten a session because the vehicle overheated.  Due to GM's failure to disclose the cooling defect, Mr. Zachacz was denied the benefit of the bargain at the time of sale, and paid a premium for a vehicle that he would not have paid.  Mr. Zachacz has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

### 5.     Michigan Plaintiff

28.     Plaintiff David Linderman is an individual residing in Lombard, Illinois.  On February 26, 2016, Mr. Linderman purchased a 2016 DSOM Corvette Z06 Convertible, 2LT, A8 AUTO Transmission from Matick Chevrolet, an authorized GM dealer in Redford, Michigan, for approximately $93,000.  The vehicle is covered by a manufacturer's warranty.

29.     Mr. Linderman purchased and still owns this vehicle.  Unknown to Mr. Linderman at the time he purchased the vehicle, the Corvette Z06 suffered from defects.  GM knew about these defects but did not disclose the defects to Mr. Linderman, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable, that the vehicle was intended to be a vehicle

- 16 -

that could be used on the track or at high speeds, and that it was capable of safely performing these operations.

30.     Mr. Linderman selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced.  Mr. Linderman reviewed print and online advertisements showing photographs of the 2016 Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track Mode" and a track-enhanced heads-up display.  There are five modes: weather, economy, touring, sport, and track.  Track has three additional sub-settings.  None of the information reviewed by Mr. Linderman contained any disclosure relating to any defects in the 2016 Corvette Z06 or indicating that the 2016 Corvette Z06 was unreliable and unsafe when used on the track.

31.     Mr. Linderman's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track Mode" and a track enhanced heads-up display.  Last March, Mr. Linderman visited Spring Mountain (a track outside Las Vegas that GM has a partnership with and subsidizes sending new Corvette owners to) where he was

- 17 -

taught how to use these track modes.  The students were also told that you have no business using "track mode" if you are not on a track. The "track mode" (as well the other modes) affects everything about the car, from magnetic ride suspension, throttle response, braking, and exhaust noise, all the way to the dash and heads-up display. If GM had disclosed to Mr. Linderman that his vehicle transmission suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

32.    On June 27, 2017, at approximately 5:45 p.m., on the way home after some spirited but local street driving, his vehicle's DIC flashed a message about "engine overheating" and "Limp Mode," plus the service engine light icon came on.  Mr. Linderman was on a back road.  He pulled off and made a U-turn to stay away from main roads. The vehicle drove like it was powered by 2 cylinders and felt like it had no power steering.  When Mr. Linderman went to cross an intersection with oncoming traffic, he was concerned his Corvette Z06 was not going to make it across.  He went to a parking lot and sat in the shade and turned the car off.  He waited a while, then restarted the vehicle.

33.    Mr. Linderman planned to use his 2016 Corvette Z06 on the road and on the track but has not tracked the vehicle because he is concerned about the vehicle going into Limp Mode.  Due to GM's failure to disclose the cooling defect,

- 18 -

Mr. Linderman was denied the benefit of the bargain at the time of sale, and paid a premium for a vehicle that he would not have paid.  Mr. Linderman has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

### 6.    Missouri Plaintiff

34.    Plaintiff Steven Closser is an individual residing in Blue Springs, Missouri.  On June 4, 2016, Mr. Closser purchased a 2015 Corvette Z06 Convertible 2LT with some 3LT additional parts installed at a GM factory from Molle Chevrolet, an authorized GM dealer in Blue Springs, Missouri, for more than $100,000.  The vehicle is covered by a manufacturer's warranty.  Mr. Closser purchased the vehicle for both road and track use.

35.    Mr. Closser purchased and still owns this vehicle.  Unknown to Mr. Closser at the time he purchased the vehicle, the Corvette Z06 suffered from defects.  GM knew about these defects but did not disclose the defects to Mr. Closser, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable, that the vehicle was intended to be a vehicle that could be used on the track or at high speeds, and that it was capable of safely performing these operations.

36.    Mr. Closser selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most

capable track-Corvette" ever produced.  Mr. Closser reviewed print and online advertisements showing photographs of the 2015 Corvette Z06 on race tracks and read about how various components in all 2015 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  None of the information reviewed by Mr. Closser contained any disclosure relating to any defects in the 2015 Corvette Z06 or that the 2015 Corvette Z06 was unreliable and unsafe when used on the track.

37.     Mr. Closser's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  If GM had disclosed to Mr. Closser that his vehicle transmission suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

38.     Mr. Closser's Corvette Z06 overheated and went into Limp Mode when he was at the track at Mid-America Park, just across from the Bowling Green Plant in Missouri.  Mr. Closser reported the overheating to his local dealer and was told that it was because he "was in track mode and the 8-speed automatic shifts at red line."

- 20 -

39.     Mr. Closser planned to use his 2015 Corvette Z06 on the road and on the track but has not tracked the vehicle since because he is concerned about the vehicle going into Limp Mode.  Due to GM's failure to disclose the cooling defect, Mr. Closser was denied the benefit of the bargain at the time of sale, and paid a premium for a vehicle that he would not have paid.  Mr. Closser has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

**7.     Nevada Plaintiff**

40.     Plaintiff James DiIorio is an individual residing in Las Vegas, Nevada.  On November 13, 2015, Mr. DiIorio purchased a new 2016 Corvette Z06 1YG for approximately $83,000 from Findlay Chevrolet, an authorized GM dealer in Las Vegas, Nevada.  The vehicle is covered by a manufacturer's warranty.  Mr. DiIorio purchased the vehicle for both road and track use and to participate in high-speed rallies, high-speed racing events.  He is a self-described hard-core performance enthusiast with over 40 years of experience with high performance vehicles and track experience.

41.     Mr. DiIorio purchased and still owns this vehicle.  Unknown to Mr. DiIorio at the time he purchased the vehicle, the Corvette Z06 suffered from defects.  GM knew about these defects but did not disclose the defects to Mr. DiIorio, so he purchased his vehicle on the reasonable but mistaken belief that his

- 21 -

vehicle would be safe and reliable and that the vehicle was intended to be a vehicle that could be used on the track or at high speeds and was capable of safely performing these operations.

42.    Mr. DiIorio selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most track-capable car" ever produced.  Mr. DiIorio reviewed print and online advertisements showing photographs of the 2016 Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  None of the information reviewed by Mr. DiIorio contained any disclosure relating to any defects in the 2016 Corvette Z06 or that the 2016 Corvette Z06 was unreliable and unsafe when used on the track.

43.    Mr. DiIorio's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  If GM had disclosed to Mr. DiIorio that his vehicle's cooling system suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

44.     Mr. DiIorio's 2016 Corvette Z06 has been on a race track three times it overheated every time.  He has complained about this problem repeatedly to the service manager at the Chevrolet dealership where he purchased his vehicle.  The Chevrolet dealership eventually agreed to install two upgrades to the vehicle at a cost to Mr. DiIorio of almost two thousand dollars.  The upgrades were not covered under the vehicle's warranty as they should have been, nor did they work. Mr. DiIorio's Corvette Z06 still runs hot.

45.     From a 2017 Corvette Z06, the dealership installed a larger, upgraded supercharger lid and hood insulator -- change the factory made to all 2017 Z06's in order to address the cooling issues.  The service manager also installed a factory 100-octane ECM/TCM program that re-flashes the ECM so that the motor runs on 100-octane, instead of the normal 91-octane premium gas.  Not only did the upgrades not work, but now Mr. DiIorio's vehicle can only run on expensive $9.00/gallon race gas, not normal $3.00/gallon premium fuel.  As a result, Mr. DiIorio is unable to drive his Corvette Z06 fast (which is why he bought it), and it costs him over $100 to fill up the tank.  The last time he took it to the track after the upgrade, he only made it twice around the track before the vehicle overheated.

46.     In Mr. DiIorio's experience, you do not need to take the Corvette Z06 to the track to experience overheating cooling problems.  It takes only 15+ seconds of hard, sustained acceleration for the coolant and oil temperatures to reach

- 23 -

dangerous levels which have forced him to shut his vehicle down in order to prevent damage to the motor.  Mr. DiIorio has experienced this problem even when the weather in Las Vegas was in the 75 to 80-degree range. Mr. DiIorio eventually stopped driving the vehicle.

47.    Mr. DiIorio met in person with both the general manager and head service manager from Findlay Chevrolet and they acknowledged the problem with the cooling system and were sympathetic to his plight.  However, the dealership claimed their hands were tied by GM and there was nothing they could do.  Mr. DiIorio even demanded that the dealership buy back his vehicle and that they give him a refund.  The dealership steadfastly refused and will no longer correspond with Mr. DiIorio.

48.    Due to GM's failure to disclose the cooling defect, Mr. DiIorio was denied the benefit of the bargain at the time of sale, and paid a premium for a vehicle that he would have not have. Mr. DiIorio has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

**8.    Ohio Plaintiff**

49.    Plaintiff John Bleich is an individual residing in Dallas, Texas.  On August 2, 2015, Mr. Bleich purchased a 2016 Corvette Z06 with 07 option from Coughlin Chevrolet, an authorized GM dealer in Pataskula, Ohio, for $112,302.50.

- 24 -

The vehicle is covered by a manufacturer's warranty.  Mr. Bleich purchased the vehicle for both road and track use.

50.     Mr. Bleich purchased and still owns this vehicle.  Unknown to Mr. Bleich at the time he purchased the vehicle, the Corvette Z06 suffered from defects.  GM knew about these defects but did not disclose the defects to Mr. Bleich, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable, that the vehicle was intended to be a vehicle that could be used on the track or at high speeds, and that it was capable of safely performing these operations. When in Limp Mode, the vehicle can be going as slow as 30–40 mph while the vehicles that are trying to pass are travelling 90–120 mph, if not more, so there is an extreme safety issue involved.

51.     Mr. Bleich selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced.  Mr. Bleich reviewed print and online advertisements showing photographs of the 2016 Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, special transmission, special cooling, track mode with software-governing suspension, shifting, tuning, a video data recorder indicating G Force, speed, transmission gear, and a heads-up display used for racing.  None of the information reviewed by Mr.

- 25 -

Bleich contained any disclosure relating to any defects in the 2016 Corvette Z06 or indicating that the 2016 Corvette Z06 was unreliable and unsafe when used on the track. Additionally, there was no disclosure that stated the vehicle was not capable of sustained track use when ambient temperatures were 85 degrees or higher.

52. Mr. Bleich's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, a special engine, and specific software settings, including a heads-up display ideally suited for racing. If GM had disclosed to Mr. Bleich that his vehicle engine and/or transmission suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it, or he would have possibly purchased another model or competitors vehicle.

53. Mr. Bleich has experienced Limp Mode in his vehicle due to overheating after typically three laps at the track when the temperature is above 85 degrees. Mr. Bleich only has three track days on his vehicle, and it has overheated every time. Due to GM's failure to disclose the cooling defect, Mr. Bleich was denied the benefit of the bargain at the time of sale, and paid a premium for a vehicle that he would not have paid. Mr. Bleich has also suffered additional damage relating to the cost of improvements/repairs needed to make the vehicle operate as a reasonable consumer would have expected.

- 26 -

### 9. Pennsylvania Plaintiff

54. Plaintiff Brian Nakel is an individual residing in Mars, Pennsylvania. On April 20, 2016, Mr. Nakel purchased a 2016 Chevrolet Corvette Z06 2LT for $80,000 from Classic Chevrolet, an authorized GM dealer in Pittsburgh, Pennsylvania. The vehicle is covered by a manufacturer's warranty.

55. Mr. Nakel purchased and still owns this vehicle. Unknown to Mr. Nakel at the time he purchased the vehicle, the Corvette Z06 suffered from defects. GM knew about these defects but did not disclose the defects to Mr. Nakel, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable, that the vehicle was intended to be a vehicle that could be used on the track or at high speeds, and that it was capable of safely performing these operations.

56. Mr. Nakel selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced. Mr. Nakel reviewed print and online advertisements showing photographs of the 2016 Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. None of the information reviewed by Mr. Nakel contained any

- 27 -

disclosure relating to any defects in the 2016 Corvette Z06 or that the 2016 Corvette Z06 was unreliable and unsafe when used on the track.

57.     Mr. Nakel's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. If GM had disclosed to Mr. Nakel that his vehicle's cooling system suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

58.     Mr. Nakel has already noticed that his vehicle heats up very quickly and is concerned that the vehicle will overheat and go into Limp Mode if he drives it fast. He finds that he is constantly watching the temperature when he is driving, so he is not able to drive the vehicle the way he wants to. Mr. Nakel is also concerned that the car will heat up even faster in the summer in Pittsburgh and that he will not be able to drive it at all this summer. Due to GM's failure to disclose the cooling defect, Mr. Nakel was denied the benefit of the bargain at the time of sale and paid a premium for the vehicle that he otherwise would not have paid. Mr. Nakel has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

010687-11 1014581 V1

10.    **South Carolina**

59.    Plaintiff John Herold is an individual residing in Lutz, Florida. On May 18, 2017, Mr. Herold purchased a 2017 Corvette Z06 Z07 3LZ from Mike Reichenbach Chevrolet, an authorized GM dealer in Okatie, South Carolina, for approximately $120,000. The vehicle is covered by a manufacturer's warranty. Mr. Herold purchased the vehicle for both road and track use.

60.    Mr. Herold purchased and still owns this vehicle. Unknown to Mr. Herold at the time he purchased the vehicle, the Corvette Z06 suffered from defects. GM knew about these defects but did not disclose the defects to Mr. Herold, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable, that the vehicle was intended to be a vehicle that could be used on the track or at high speeds, and that it was capable of safely performing these operations.

61.    Mr. Herold selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced. Mr. Herold reviewed print and online advertisements showing photographs of the 2017 Corvette Z06 on race tracks and read about how various components in all 2017 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used

- 29 -

for racing.  None of the information reviewed by Mr. Herold contained any disclosure relating to any defects in the 2017 Corvette Z06 or indicating that the 2017 Corvette Z06 was unreliable and unsafe when used on the track.

62.    Mr. Herold's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing.  If GM had disclosed to Mr. Herold that his vehicle transmission suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

63.    Mr. Herold has experienced Limp Mode in his vehicle due to overheating every time he goes to the track.  He has also experienced Limp Mode due to overheating during heavy traffic on a hot day.  Due to GM's failure to disclose the cooling defect, Mr. Herold was denied the benefit of the bargain at the time of sale, and paid a premium for the vehicle that he would not have paid.  Mr. Herold has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

**11.    Texas Plaintiff**

64.    Plaintiff Jedediah Blanks is an individual residing in Santa Fe, Texas. On October 31, 2016, Mr. Blanks purchased a 2016 Chevrolet Corvette Z06 3LZ

- 30 -

for $82,276.60 from Leo Martin Chevrolet, an authorized GM dealer in Lake Jackson, Texas. The vehicle is covered by a manufacturer's warranty. Mr. Blanks purchased the vehicle for both road and track use.

65.    Mr. Blanks purchased and still owns this vehicle. Unknown to Mr. Blanks at the time he purchased the vehicle, the Corvette Z06 suffered from defects. GM knew about these defects but did not disclose the defects to Mr. Blanks, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable, that the vehicle was intended to be a vehicle that could be used on the track or at high speeds, and that it was capable of safely performing these operations.

66.    Mr. Blanks selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced. Mr. Blanks reviewed print and online advertisements showing photographs of the 2016 Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. None of the information reviewed by Mr. Blanks contained any disclosure relating to any defects in the 2016 Corvette Z06 or indicating that the 2016 Corvette Z06 was unreliable and unsafe when used on the track.

- 31 -

67.    Mr. Blanks' vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. If GM had disclosed to Mr. Blanks that his vehicle's cooling system suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

68.    Mr. Blanks planned to use his 2016 Corvette Z06 on the road and on the track but stopped taking it to the track after his vehicle overheated went into Limp Mode on the track after two laps. Due to GM's failure to disclose the cooling defect, Mr. Blanks was denied the benefit of the bargain at the time of sale and paid a premium for a vehicle that he otherwise would have not have. Mr. Blanks has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

**B.    Defendant**

69.    General Motors LLC is a corporation doing business in all 50 states and the District of Columbia, and is organized under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan. At all times relevant to this action, GM manufactured, sold, leased, and warranted the Z06s at issue throughout the United States. GM and/or its agents designed, manufactured,

- 32 -

and installed the defective cooling systems in the Z06s. GM also developed and disseminated the owner's manuals, supplements, and warranty booklets, advertisements, and other promotional materials relating to the Z06s, and provided these to GM's authorized dealers for the express purpose of having these dealers pass such materials on to potential purchasers. GM also created, designed, and disseminated information about the track capabilities of the Z06 to various agents of various publications for the express purpose of having that information reach potential consumers.

## V.    FACTUAL ALLEGATIONS

**A.    Track enthusiasts share a passion for racing their vehicles on closed tracks.**

70.    There is a segment of car purchasers who buy cars that are designed to be used, in part, on race tracks. Often called "track enthusiasts," these car purchasers are passionate about motorsports and relish a challenging driving experience. Track enthusiasts often purchase their enthusiast vehicle so that they can drive on public roads as well as specialized race tracks. The Z06 has been heavily advertised as track-capable, and GM aggressively markets the Z06 to track enthusiasts.

**B.    Specialized race tracks create safe conditions for track enthusiasts to pursue their passion.**

71.    Track enthusiasts purchase race cars to drive on closed race tracks. There are dozens of race tracks across the United States where track enthusiasts are

- 33 -

allowed to bring their Z06 and operate them at very high speeds on closed tracks that are sealed off from all other highways and roads. A track enthusiast purchases time at a track—usually in 30-minute increments—and drives on the track with other cars also racing at the same time. Typically, these race tracks provide a safe and welcoming environment for participants to explore the capabilities and limits of their high-performance sports cars while improving their driving skills. Race tracks can also provide instruction and coaching for drivers of all skill levels. The main priority for both track enthusiasts and race track operators is always safety—both for track drivers and others who may be physically located near the race track. As such, speed and distance is closely monitored and specialized etiquette mores—or rules of the road—must be adhered to at all times.

**C.    "Track-proven" vehicles operate under extreme conditions and must meet certain basic safety features to operate on a race track.**

72.    "Track-proven" Z06s routinely reach speeds in excess of 125 mph on specialized race tracks and operate under conditions that place an extreme amount of stress on Z06 systems. To keep track drivers and others safe, "track-proven" Z06s are not equipped in the same way as typical consumer Z06s. Two important differences relate to the transmission system and rear differentials in "track-proven" Z06s.

### 1. Transmission systems in "track-proven" vehicles

73.    In the context of motor Z06s, a transmission system takes the power generated by the Z06's engine and applies that power to calibrate the speed and torque of the wheels. This process is accomplished by the driver shifting through different gears. Slower, or lower, gears are used to slow down the output speed of the engine and increase torque. Higher gears increase the output speed and decrease torque. Further, race track conditions often require drivers to change gears extremely quickly—usually in a fraction of a second. As such, the transmission system for "track-proven" Z06s must come equipped with certain features, such as transmission coolers, to cope with the high engine speeds and fast, frequent gear shifts consistent with the rigors of track use. Without these features, the transmission systems in Z06s, for example, will overheat, causing the vehicle to go into Limp Mode. As explained in more detail below, Limp Mode refers to a scenario where, to prevent damage, a Z06 automatically regresses to a lower RPM (revolutions per minute) with a drastically slower speed, much to the surprise of the individual driver and those driving nearby.

### 2. Differentials in "track-proven" vehicles

74.    A rear differential is a component in all cars and is designed to compensate for the difference in distance the inner wheels and outer wheels travel as the car goes around a corner. For track drivers—who routinely turn corners

- 35 -

while pressing on the gas in a powerful car—poor rear differentials can cause the inside wheel to start to over-spin, leading to less grip and traction. The driver then loses the ability to properly maneuver the outside wheel and can potentially lose control of the Z06. This can result in erratic driving and an increased risk for collisions.

75.     Owners of "track-proven" Z06s therefore must ensure that their rear differentials remain fully operational by allowing for the application of a specialized cooler.

**D.     The Corvette Z06 was marketed as if it could operate on race tracks because GM knew this was material to potential buyers.**

**1.     The product information materials promoted track use.**

76.     From its introduction, GM described the Z06 as fit for the track due to its superior performance technology, as explained in this 2015 vehicle information kit:

> Vehicle Highlights
>
> - All-new model enters **supercar territory with race-proven design**, advanced technologies and world-class performance
>
> - With **track-focused Z07 performance package**, 2015 Corvette Z06 delivers faster lap times than 2014 Corvette ZR1
>
> - First Corvette Z06 to offer supercharged engine, paddle-shift automatic transmission and removable roof panel for coupes, and convertible model

- 36 -

- New LT4 supercharged 6.2L V-8 SAE-certified at 659 hp (485 kW) and 881 Nm of torque

## 2015 CORVETTE Z06 IS THE MOST CAPABLE CORVETTE EVER

The Z06 rejoins the Corvette lineup for 2015 as the most capable model in the iconic car's 62-year history. It stretches the performance envelope for Corvette with unprecedented levels of aerodynamic downforce – and it **is the first Corvette Z06 to offer a supercharged engine**, an eight-speed paddle-shift automatic transmission and, thanks to a stronger aluminum frame, a removable roof panel.

The new LT4 supercharged 6.2L V-8 engine is SAE-certified at 650 horsepower (485 kW) at 6,400 rpm and 650 lb-ft of torque (881 Nm) at 3,600 rpm – making the 2015 Corvette Z06 the most powerful production car ever from General Motors and one of the most powerful production cars available in the United States. With the available Z07 package, its capability enables:

- 0-60 mph acceleration in 2.95 seconds with the eight-speed automatic and 3.2 seconds with the seven-speed manual transmission

- Quarter-mile times of 10.95 seconds at 127 mph with the eight-speed and 11.2 seconds at 127 mph with the seven-speed transmission a

- Lateral acceleration of 1.2 g

- 60-0 mph braking in only 99.6 feet – the best of any production car tested by General Motors.

77.    GM's 2015 product information brochure proclaimed that it borrowed

from its Racing Corvette to make the Z06 track ready:

"The Corvette Z06 is a great example of the technology transfer between racing and production Corvettes," said Juechter. "First, we took what we learned on the Corvette Racing C6.R and applied that to the all-new Corvette Stingray. Then, using the Stingray as a foundation, the

- 37 -

Z06 and C7.R were developed to **push the envelope of performance on the street and the track**."

78.    In the brochure, GM also proclaimed that it met performance targets by adding features to address cooling issues:

> "Practically every exterior change served a functional purpose, as this beast needed more of everything," said Tom Peters, Corvette design director. "The flared fenders accommodate larger, wider wheels and tires for more grip. **The larger vents provide more cooling air to the engine, brakes, transmission and differential for increased track capability**. The more aggressive aerodynamic package generates true downforce for more cornering grip and high-speed stability."

79.    A high-performance engine running on a track produces high temperatures that must be dealt with. GM assured consumers in its 2015 brochure that the Z06 could handle high temperatures:

> **The exterior design also reflects the increased cooling required for the new Corvette Z06. For example, the mesh pattern on the front fascia was painstakingly designed to deliver the most possible airflow to the supercharger's intercooler heat exchanger**, so much so that the mesh grill directs more air into the engine bay than if the grille was removed.

> **Additional cooling elements include larger front fender vents and unique air blades over the inlets on the rear fenders of Coupe models, which force about 50 percent more air into the cooling ducts for the transmission and differential coolers than those on the Stingray**. Convertible models feature under-body inlets. To cope with the additional airflow, Z06 Coupe and Convertible also have larger rear-fascia openings than the Stingray.

> **Standard front and rear brake-cooling ducts, including Z06-signature rear ducts integrated in front**

- 38 -

**of the rear fender openings, are also part of the
functional design changes over Stingray models**.

80.   To appeal to track enthusiasts, GM, in its 2015 brochure and in other

promotional material claiming the Z06 was track proven, stated:

> **Track-proven structure and technologies**
>
> The 2015 Corvette Z06 leverages the technologies
> introduced on the Corvette Stingray, including the
> strategic use of lightweight materials and advanced driver
> technologies, with unique features and calibrations
> tailored for its capabilities.
>
> "Our mission with the seventh-generation Corvette was
> to make the performance levels more accessible, enabling
> drivers to exploit every pound-foot of torque, every "g"
> of grip and every pound of downforce," said Juechter.
> "It's a philosophy we introduced with the 460-
> horsepower Corvette Stingray – and one that's even more
> relevant with 650 horsepower at your beck and call."
>
> The new Z06 retains the SLA-type front and rear
> suspension design of the Corvette Stingray but is
> uniquely calibrated for the higher performance threshold.
> The third-generation Magnetic Selective Ride Control
> dampers are standard on Z06. **They can be adjusted for
> touring comfort or maximum track performance via
> the standard Driver Mode Selector**.

**2.   The features on the Z06 are those one would expect in a track-
ready car.**

81.   GM sold the 2015 Z06 with three trim levels: Standard, Aero

Package, and Z07 Package. The difference in trims were as follows:

- The standard Z06 features a front splitter, spats
  around the front wheel openings, a unique carbon-
  fiber hood with a larger vent, and a rear spoiler

- An available carbon-fiber aero package - in either
  black or a visible carbon-fiber finish - adds a
  carbon fiber front splitter with aviation-style

- 39 -

winglets, carbon fiber rocker panels, and a larger
rear spoiler with a fixed wickerbill, which combine
to create true aerodynamic downforce

- The available Z07 package add larger winglets to
the front splitter, along with an adjustable, see-
through center section on the rear spoiler for track
use. With this package, the Corvette Z06 delivers
the most aerodynamic downforce of any
production car GM has tested.

82.    Additionally, the Z06s were equipped with dozens of features that
would suggest to a reasonable person that the vehicles were built with the intention
of occasional track use. Some of these features included the following: an LT4
supercharged 6.2L V-8 engine with 650 horsepower at 6,400 rpm and 650 lb-ft of
torque at 3,600 rpm, making the Z06 "one of the most powerful production cars
ever from General Motors"; special tires to deliver the "grip needed for the Z06's
performance targets"; special steering and performance brakes; and specific
software settings, including a "Track App" and a heads-up tachometer display used
for racing. Even the leather seats were outlined with fabric to mitigate against
passengers slipping and sliding in their seats while taking corners at high speeds.

**3.    The Z06 Owner's Manual contemplates track use.**

83.    Track use is contemplated in the Owner's Manual. For example, the
2015 Z06 Owner's Manual contemplates track use:

**Track Events and Competitive Driving**

Participating in track events or other competitive driving
without following the instructions provided may affect

- 40 -

the vehicle warranty. See the warranty manual before using the vehicle for racing or other competitive driving.

**Launch Control**

Available only in Track mode for maximum "off-the-line" acceleration when in Competitive or PTM modes.

**Competitive Driving Mode**

If equipped, Competitive Driving Mode, Performance Traction Management, and Launch Control are systems designed to allow increased performance while accelerating and/or cornering. This is accomplished by regulating and optimizing the engine, brakes, and suspension performance. These modes are for use at a closed course race track and are not intended for use on public roads. They will not compensate for driver inexperience or lack of familiarity with the race track. Drivers who prefer to allow the system to have more control of the engine, brake, and suspension are advised to turn the normal traction control and StabiliTrak systems on.

84.    The 2016 Z06 Owner's Manual had additional provisions regarding

track use:

- 41 -

**Racing/Track Brake Burnishing Procedure (Z06 with Z07 Performance Package or Z06 with J57 Ceramic Brakes)**

This procedure should only be run on a track and only on dry pavement.

### Caution

Brake pedal fade will occur during this track burnish procedure and can cause brake pedal travel and force to increase. This could extend stopping distance until the brakes are fully burnished.

1. Drive a normal first lap, not too aggressively.

2. Laps 2 and 3 should be gradually driven faster and more aggressively, while allowing for reduced brake output and increased stopping distance due to brake fade.

3. Drive Lap 4 near full speed, while allowing for reduced brake output and increased stopping distance due to brake fade.

4. Laps 5 and 6 should be cool down laps.

5. Lap 7 should be normal driving or an easy out lap.

### Z07 Performance Package

The Z07 Performance Package has an installed Stage 2 Aero Package, which consists of a front splitter with short end caps, rocker panel extensions, and a rear spoiler.

Stage 3 Aero components are delivered but not installed on the vehicle. These are intended to be installed for track use only. The components include:

- Front splitter tall end caps that replace the front splitter short end caps.

- A center transparent wicker bill for the rear spoiler.

### ⚠ Warning

Changing the following track settings could reduce tire traction and could cause a crash. Do not change the track settings.

The track settings for the Z07 Performance Package with the Stage 3 Aero Package are:

- The front splitter tall end caps installed.

- The center transparent wicker bill installed all the way up on the rear spoiler.

- The Driver Mode Selector in Track Mode.

### Stingray with Performance Package-Carbon Fiber (CFZ)

The Stingray with Performance Package-Carbon Fiber (CFZ) has an installed aero package which consists of a front splitter with short end caps, rocker panel extensions, and a rear spoiler. A center transparent wicker bill for the rear

### Competitive Driving Mode

If equipped, Competitive Driving Mode, Performance Traction Management, and Launch Control are systems designed to allow increased performance while accelerating and/or cornering. This is accomplished by regulating and optimizing the engine, brakes, and suspension performance. These modes are for use at a closed course race track and are not intended for use on public roads. They will not compensate for driver inexperience or lack of familiarity with the race track. Drivers who prefer to allow the system to have more control of the engine, brake, and suspension are advised to turn the normal traction control and StabiliTrak systems on.

### Caution

Attempting to shift when the drive wheels are spinning and do not have traction may cause damage to the transmission. Damage

(Continued)

### Caution (Continued)

caused by misuse of the vehicle is not covered by the vehicle warranty. Do not attempt to shift when the drive wheels do not have traction.

### Competitive Driving Mode (Except Z51 and Z06 with Magnetic Ride Control)

Competitive Driving Mode allows full engine power while StabiliTrak helps maintain directional control of the vehicle by selective brake application. In this mode, TCS is off and Launch Control is available. Adjust your driving style to account for the available engine power. See "Launch Control" later in this section.



## Performance Traction Management (Z51 and Z06 with Magnetic Ride Control)

Performance Traction Management (PTM) integrates the Traction Control, StabiliTrak, and Magnetic Ride Control systems to provide improved and consistent performance when cornering. The amount of available engine power is based on the mode selected, track conditions, driver skill, and the radius of each corner.



This light is on when the vehicle is in the PTM mode.

To select this optional handling mode, the vehicle mode must be Track. Then quickly press the TCS/StabiliTrak button on the center console two times. PERF TRAC 1 - WET ACTIVE HANDLING ON displays in the DIC.

To experience the performance benefit of this system, after entering a curve and at the point where normal acceleration occurs, fully push the accelerator pedal. The PTM system will modify the level of engine power for a smooth and consistent corner exit.



The PTM system contains five modes. These modes are selected by turning the Selective Ride Control/Performance Traction Management MODE SELECT knob on the center console. Scroll up or down through modes 1–5 by turning the MODE SELECT knob to the right or left.

The following is a DIC description and the recommended usage of each mode:

### PERF TRAC 1 – WET ACTIVE HANDLING ON

- Intended for all driver skill levels.
- Wet or damp conditions only — not intended for use in heavy rain or standing water.
- StabiliTrak is on and engine power is reduced based on conditions.

### PERF TRAC 2 – DRY ACTIVE HANDLING ON

- For use by less experienced drivers or while learning a new track.
- Dry conditions only.
- StabiliTrak is on and engine power is slightly reduced.

### PERF TRAC 3 – SPORT ACTIVE HANDLING ON

- For use by drivers who are familiar with the track.
- Dry conditions only.
- Requires more driving skill than mode 2.
- StabiliTrak is on and more engine power is available than in mode 2.

### PERF TRAC 4 – SPORT ACTIVE HANDLING OFF

- For use by drivers who are familiar with the track.
- Dry conditions only.
- Requires more driving skill than modes 2 or 3.
- StabiliTrak is off and available engine power is the same as mode 3.

- 43 -

**PERF TRAC 5 – RACE ACTIVE HANDLING OFF**

- For use by experienced drivers who are familiar with the track.
- Dry conditions only.
- Requires more driving skill than in other modes.
- StabiliTrak is off and engine power is available for maximum cornering speed.

Press and release the TCS/ StabiliTrak ⚙ button to turn off PTM and return to the traction control and StabiliTrak systems. The traction off light ⚙ and StabiliTrak OFF light ⚙ will go out.

**Launch Control (Track Mode Only)**

A Launch Control feature is available, within Competitive Driving Mode (except Z51 and Z06 with Magnetic Ride Control) or Performance Traction Management (Z51 and Z06 with Magnetic Ride Control), on all vehicles to allow the driver to achieve high levels of vehicle acceleration in a straight line. Launch Control is a form of traction control that manages tire spin while launching the vehicle. This feature is intended for use during closed course race events where consistent zero to 60 and quarter mile times are desirable.

Launch Control is only available when the following criteria are met:

- Competitive Driving Mode is selected (except Z51 and Z06 with Magnetic Ride Control) or any of the Performance Traction Management modes are selected (Z51 and Z06 with Magnetic Ride Control). The TCS light comes on the instrument panel and the appropriate DIC message displays.
- The vehicle is not moving.
- The steering wheel is pointing straight.

**4.    Press kits were created by GM to entice track enthusiasts to purchase a Z06**

85.    GM also made available online, and in other forums, different press kits outlining the unique features of the Z06. These kits provided a substantial amount of detail on the Z06 as well as several specific misrepresentations that the Z06s were designed to be used on a race track. For example, the 2016 Product Information Kit proclaimed that the Z06 was "track-proven," as had been the claim in the 2015 product kit:

- 44 -

### Track-proven structure and technologies

The Corvette Z06 leverages the technologies introduced on the Corvette Stingray, including the strategic use of lightweight materials and advanced driver technologies, with unique features and calibrations tailored for its capabilities.

Its aluminum frame is produced in-house at General Motors' Bowling Green assembly plant. It's the same robust, lightweight frame used on the Corvette Stingray and it is used essentially unchanged for the C7.R race cars.

86.    The kit described features that were designed for use on the track:

 Chevrolet Product Information

The stiffer design of the aluminum frame allows the Corvette Z06 to be offered with a removable roof panel for the first time. With the lightweight, carbon fiber roof panel removed, the new Corvette Z06 offers 20 percent more structural rigidity than the previous model's fixed-roof design. It is 60 percent stiffer than the previous model with the roof panel installed.

The new Z06 retains the SLA-type front and rear suspension design of the Corvette Stingray but is uniquely calibrated for the higher performance threshold. The third-generation Magnetic Selective Ride Control dampers are standard on Z06. They can be adjusted for touring comfort or maximum track performance via the standard Driver Mode Selector.

Like the Stingray, the Driver Mode Selector tailors up to a dozen features of the Z06 to suit the driver's environment, including:

- **Launch control:** Available in Track mode for manual and automatic transmissions, providing maximum off-the-line acceleration
- **Active handling (StabiliTrak electronic stability control):** A "competitive" setting is available in Track mode and is more suited for on-track conditions. It can also be disabled, giving the driver complete control
- **Traction control:** Weather mode tailors traction control and engine torque for driving in inclement conditions
- **Performance Traction Management:** Available in Track mode and offers five settings of torque reduction and brake intervention for track driving
- **Electronic Limited Slip Differential:** Adjusts the rate at which the limited slip engages to balance between steering response and stability in different driving conditions with more aggressive performance in Sport and Track modes.

The smart electronic limited-slip differential, or eLSD, is standard on the Z06 to make the most of the torque split between the rear wheels. The system features a hydraulically actuated clutch that can infinitely vary clutch engagement and can respond from open to full engagement in tenths of a second. It shifts torque based on a unique algorithm that factors in vehicle speed, steering input and throttle position to improve steering feel, handling balance and traction.

- 45 -

**5.    GM sponsored track events to demonstrate the "track-readiness" of the Z06.**

87.    GM also sponsored several track events where the Z06 was prominently featured and marketed to track enthusiasts and promoted "Corvette Owner's Schools" where Corvette owners were encouraged to develop their track skills.

**E.    The Corvette Z06 cannot be safely raced on the track due to design and manufacturing defects in the cooling system.**

**1.    The nature of the defects and their safety consequences**

88.    The performance of a car on the track is a material factor in the decision to purchase a Z06.

89.    However, Z06s cannot be effectively and safely used on the track due to a defective cooling system. As a result, the engine will overheat if it operates on the track during a typical track session, which causes the Z06 to go into Limp Mode to prevent permanent damage, or causes the driver to see the overheat gauge and pit the car before it goes into Limp Mode. Typically, Z06s in Limp Mode can immediately go from well over 100 mph to a substantially lower speed and lose power. As a result, the driver can become disoriented and lose control of the Z06, increasing the risk of an accident. This scenario is also extremely dangerous for other drivers operating at high speeds nearby who do not expect the car racing in front of them to essentially freeze on the track, thereby putting them at risk for accidents as well.

- 46 -

90.     The Z06s also contain a manufacturing defect in that unexpected overheating of a powertrain system can damage other essential operations of the vehicle, including the engine, clutch, rear end, and other parts. Coolers are required not only for Z06s that will be used on a race track, but for all non-racing Z06s, as well, because coolers are required for the purpose of preventing premature failure of the engine, drivetrain, transmission, rear differential, and other parts due to routine high temperatures not experienced in cars with coolers. Thus, track enthusiasts are faced with an impossible choice: (1) allow for overheating events to occur at unexpected times, thereby causing increased safety risks as well as damage to the engine, transmission, drivetrain, differential, and other parts of the Z06; or (2) take a gamble by modifying their car with aftermarket repairs that were not initially envisioned by GM engineers and cross their fingers that such modifications will not affect the performance or long-term reliability of their Z06, let alone the future enforcement of their express warranties. Under either of these scenarios, track enthusiasts are not getting what they bargained for.

91.     Frighteningly, the same Limp Mode can also unexpectedly occur on the road during non-track conditions. If Limp Mode occurs on a public highway, for example, it presents a completely distinct safety issue due to material differences in speed and the skill set of drivers on public roadways as compared to drivers on closed race tracks. Nevertheless, one thing is clear: even with the

inherent differences of highway driving, a Z06 rapidly decelerating on a highway is dangerous and can result in a high-speed collision. This defect is unacceptable for customers who own a Z06.

92.     The presence of Limp Mode on public roadways is not some esoteric, distant safety issue. Not only have some Plaintiffs herein alleged that they have experienced Limp Mode while on public roadways, but established publications have also reported the manifestation.

**2.     The economic consequences associated with the defects**

93.     In addition to the increased safety risks associated with the defects contained in the Z06s, Plaintiffs have also suffered economic harm as a result of GM's fraudulent conduct. First, Plaintiffs estimate that a repair to adequately correct the defects in the Z06 to make them "track-proven" would cost in excess of $20,000, including parts and labor to resolve the transmission issue only. Plaintiffs and Class members are required to pay this amount out-of-pocket, as the addition of a proper cooling system is not covered under any of GM's warranties. Second, Plaintiffs and other Class members who choose not to make these aftermarket repairs lose the ability to operate their "track-proven" Z06s on a race track and risk permanent damage to the engine, transmission, drivetrain, rear differentials, and other parts. Third, the repairs suggested by GM may constitute aftermarket

modifications that risk violating enforcement of the express warranties of the Z06s. Thus, they have not received that for which they have bargained.

94.    Plaintiffs have also suffered a diminution of value because prospective owners are now aware that if they want to actually drive safely—and conform to the rules and safety habits mandated by virtually all race track organizations—they would need to pay thousands of dollars to get the same mandatory safety features that are now standard on 2017 Z06s. This additional repair, or the inability to use this "track-proven" Z06 on a race track, will factor into the purchase price and decision of prospective buyers. Moreover, the constant overheating leads to warping of the metal parts of the engine, transmission, drivetrain, and other parts. As a result, owners of the Z06s will receive less for their vehicles on the secondary market.

95.    Plaintiffs have also paid considerable sums of money above that of the MSRP for a Z06. These premiums ranged from $1,000 to more than $20,000 on top of the list price and represents further economic loss experienced by Plaintiffs.

**F.    GM was aware of the defects in the 2015–2016 Corvette Z06 while marketing them as "track-proven."**

**1.    GM concealed the fact that the Z06 was not fit for the track.**

96.    In the first half of 2015, GM continued to make repeated false statements that Z06s were "track-proven" and "the most track-capable car" ever produced while knowing that they were unfit and unsafe for track use. Further, it is

- 49 -

not possible that GM suddenly learned of this defect, as manufacturers spend a year or more testing new models. GM had been testing Z06s on the track prior to introduction to the market and had to have discovered this defect. GM refused to disclose the defects to the public and the fact that Z06s were unfit and unsafe for race track use during this time, or that the Z06s would enter the dangerous Limp Mode if taken onto a race track and operated at high speeds.

**2.      GM admits that the Z06's cooling system was defective.**

97.     GM admitted that its Z06 had a cooling defect when it halted production in 2016 to find a solution to the overheating issue. GM admitted that it was responding to complaints of overheating and that its solution for the 2017 model was to switch to a new hood with larger vents and a new supercharger cover.

98.     The alleged "fix" does not help consumers with 2015 or 2016 Z06s. A third party, Hennessey, offers a fix in the form of a High-Flow Heat Exchanger with a Cold Induction System, but at a cost of $20,000.

**3.      GM had knowledge of the defect from consumer complaints.**

99.     Manufacturers like GM have employees who monitor internet forums and other places where consumers discuss dissatisfaction. GM monitored forums about the Z06, knew from product launch about the overheating issue, and was aware of the issue as shown below.

- 50 -

100.   On or about February 22, 2015, Tadge Juechter (Corvette's Chief Engineer) stated the following, acknowledging GM's awareness of the overheating problem in the Z06s:

> The Z06 Automatic transmission put in "Drive" selects the lowest possible gear ratio for best acceleration, and because it has 8 closely-spaced ratios typically runs higher average RPM than the manual. This optimizes lap time performance, but also taxes the engine oil and coolant more for any given track. So the automatic has the capability to run faster laps than the manual, but thermal limitations are reached more quickly. Customers who are planning to run extended track-day sessions at 'professional' speeds, are advised to go with the manual transmission, or to paddle shift the automatic and select higher gears when conditions warrant it.
>
> Any time the maximum recommended temperatures are reached in any condition, the DIC will give warnings at the appropriate time for coolant, oil, or transmission fluid. A cool-down lap or two will bring operating temperatures back to a reasonable level and aggressive track driving can be resumed.
>
> Some may wonder why don't we design to higher temperatures, say 110 degrees, to accommodate southern tracks in the Summer. We have used the "pro driver at 86 degrees" criteria for generations of Corvettes and for the vast majority of customers, it has resulted in excellent performance for their usage. If we designed to higher temperature criteria, we would have to add a lot of cooling hardware which drives mass up and perhaps more importantly, you have to feed the system with more air which has a huge impact on appearance and aerodynamic drag. Like most aspects of car design, the challenge is in finding the best balance of conflicting requirements.

- 51 -

101.   One forum GM closely monitored was "StingrayForums.com." The following is one example of a complaint that GM was aware of, which was posted in May 2014:



102.   The following is another complaint, posted in 2015 on a forum that GM monitored, commenting on "many" reports of overheating:

**Question:**
Does GM have any plan to sell a cooling pack in the future for the C7 chassis? Is it even a possibility, and if so, what would it look like?

Background
The limitations of the radiator and related parts that help the car stabilize oil and water/coolant temperature are easily reached when the C7 Z06 is driven aggressively (such as on a track at an HPDE event). There are now many reports from owners overheating the cars in 80 degree weather or even in 70 degree weather. This limitation of the car as sold will be exacerbated in the coming summer months. Many media outlets have reported overheating. This includes every occurrence when Motor Trend tested the C7 Z06 and during daily driving the C7 Stingray by Edmunds. See here:
http://www.edmunds.com/chevrolet/cor...tain-road.html

The commonly displayed overheating message is "Engine Overheating, A/C has been turned off, please idle engine." Coolant temperatures in particular quickly approach 257 degrees which prompt the computer to issue a warning in the center display.

Other manufacturers offer such an optional package to effectively cool the car. See for example the new Shelby GT350 Track Pack is described as follows: "optional with the Track Pack, an engine oil cooler and a transmission cooler."

https://media.ford.com/content/fordm...0-mustang.html

103.    The following is another forum post on StingrayForums.com:



104.   In the summer of 2015, GM was aware of the overheating issue and issued a forum post telling Z06 owners that the car was built to race in temperatures up to 86°F and that a higher temperature "affects all cars abilities to run sustained laps." The following is a post on Stingrayforums.com where a consumer states in response:





105.   The following is a May 22, 2015 forum post regarding overheating in the Z06:



010687-11 1014581 V1

106.   The following is a forum post concerning "the mammoth overheating problem":

*13 THOUGHTS ON "2015 CHEVY CORVETTE Z06: OVERHEATING ISSUE. IS IT THE 8-SPEED TRANSMISSION'S FAULT?"*

> **September 30, 2015 at 7:47 pm**
> Art Woosley
> The overheat issue and worse is squarely sitting on the narrow shoulders of Chevrolet. The know only to well that the ZO6 engine was a bomb waiting to explode and suffers mammoth overheating problem. Was the problem addressed before the car was released? Hell NO! Chevrolet decided to disregard and disrespect the valued customer and instead worship the dollar. I am FINISHED with Chevy and am finished with the GM vendetta on consumers.
> GM = GREAT MISTAKE

107.   The following is a post suggesting that the problem deserves a class action:

> **June 1, 2016 at 4:54 pm**
> Robert Kennedy
> I recently bought a 2016 Corvette Z06 C7.R Edition. 1st open track day, 1st run, 12 minutes in, oil temp goes to 320 deg. and alarms go off on the dash. I immediately slow down and the alarms stop and oil temp comes down slowly but my track day is done and any other future track days. I'm very disappointed with this vehicle given how GM is advertising the vehicle. I'm now exploring aftermarket options to correct this problem. My understanding is there are other owners of this vehicle experiencing the same problem therefore we should come together and start a class action lawsuit against GM.

108.   GM was aware of the continuous series of complaints, like those above, that continued to be posted on various online forums.

## G.   Despite express warranties, GM has not fixed the problems with the "track-proven" powertrain system.

109.   In connection with the sale (by purchase or lease) of its new Z06s, GM provides an express limited warranty on each Z06. In the warranty, GM

- 56 -

promises to repair any defect or malfunction that arises in the Z06 during a defined period. This warranty is provided by GM to Z06 owners in writing and regardless of what state the Z06 was purchased in.

110. Each Plaintiff was provided a warranty, and it was the basis of the purchase of their Z06s.

111. In its Limited Warranty and in advertisements, brochures, press kits, and other statements in the media, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period. The following uniform language appears in all Chevrolet Warranty Guides:[1]

> GM will provide for repairs to the vehicle during the warranty period in accordance with the following terms, conditions, and limitations.
>
> **What is Covered**
>
> **Warranty Applies**
>
> This warranty is for GM vehicles registered in the United States and normally operated in the United States or Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> **Repairs Covered**

---

[1] Chevrolet Motor Division, General Motors LLC, *2016 Chevrolet Limited Warranty and Owner Assistance Information*, at 4 (2016), https://my.chevrolet.com/content/dam/gmownercenter/gmna/dynamic/manuals/2016/Chevrolet/Multi-Model%20PDFs/2k16chevylimitedwty3rdPrint.pdf.

- 57 -

The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

**No Charge**

Warranty repairs, including towing, parts, and labor, will be made at no charge.

112. With regard to the Corvette Z06, the duration of the limited warranty for bumper-to-bumper protection is three years or 36,000 miles, whichever occurs first. The powertrain warranty is five years or 56,000 miles, whichever occurs first. The "warranty period . . . begins on the date the vehicle is first delivered or put in use."[2] These terms were identical for all Z06s.

113. All Plaintiffs and Class members experienced defects in their powertrain systems within the warranty period. However, despite the existence of the express warranties provided to Plaintiffs and Class members, GM has failed to honor the terms of the warranties by failing to, "at no charge," repair to correct the defect.[3]

114. Thus, it is impossible for owners to seek relief, even at their own expense, and still maintain the validity of their express warranty.

---

[2] *Id.*

[3] *Id.*

010687-11 1014581 V1

## VI.    CLASS ALLEGATIONS

115.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following classes:[4]

**Nationwide Class**

All persons or entities in the United States who are current or former owners and/or lessees of a 2015–2017 Chevrolet Corvette Z06 (the "Nationwide Class").

**Colorado Class**

All persons or entities who purchased or leased a 2015–2017 Chevrolet Corvette Z06 in the State of Colorado (the "Colorado Class").

**Connecticut Class**

All persons or entities who purchased or leased a 2015–2017 Chevrolet Corvette Z06 in the State of Connecticut (the "Connecticut Class").

**Georgia Class**

All persons or entities who purchased or leased a 2015–2017 Chevrolet Corvette Z06 in the State of Georgia (the "Georgia Class").

**Kansas Class**

All persons or entities who purchased or leased a 2015–2017 Chevrolet Corvette Z06 in the State of Kansas (the "Kansas Class").

**Michigan Class**

All persons or entities who purchased or leased a 2015–2017 Chevrolet Corvette Z06 in the State of Michigan (the "Michigan Class").

---

[4] Collectively, the "Class," unless otherwise noted.

- 59 -

### Missouri Class

All persons or entities who purchased or leased a 2015–2017 Chevrolet Corvette Z06 in the State of Missouri (the "Missouri Class").

### Nevada Class

All persons or entities who purchased or leased a 2015-2017 Chevrolet Corvette Z06 in the State of Nevada (the "Nevada Class").

### Ohio Class

All persons or entities who purchased or leased a 2015–2017 Chevrolet Corvette Z06 in the State of Ohio (the "Ohio Class").

### Pennsylvania Class

All persons or entities who purchased or leased a 2015–2017 Chevrolet Corvette Z06 in the State of Pennsylvania (the "Pennsylvania Class").

### South Carolina Class

All persons or entities who purchased or leased a 2015–2017 Chevrolet Corvette Z06 in the State of South Carolina (the "South Carolina Class").

### Texas Class

All persons or entities who purchased or leased a 2015–2017 Chevrolet Corvette Z06 in the State of Texas (the "Texas Class").

116.   Excluded from the Class are individuals who have personal injury claims resulting from the operation of a Z06. Also excluded from the Class are General Motors LLC and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

- 60 -

117.   Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

118.   This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

119.   Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of each state Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are not less than hundreds of members of each state Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from GM's books and records. At this point Plaintiffs allege, on a 50 state basis, Class members purchased or leased 8,653 model year 2015 Corvette Z06s, 14,275 model year 2016 Corvette Z06s, and over 10,000 model year 2017 Corvette Z06s. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, email, Internet postings, and/or published notice.

120.   Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact,

which predominate over any questions affecting individual Class members,

including, without limitation:

a)      Whether GM engaged in the conduct alleged herein;

b)      Whether GM designed, advertised, marketed, distributed, leased, sold, or otherwise placed Z06s into the stream of commerce in the United States;

c)      Whether the Z06 contains defects;

d)      Whether such defects cause the Z06 to malfunction;

e)      Whether GM knew about the defects and, if so, how long GM has known of the defects;

f)      Whether GM designed, manufactured, marketed, and distributed Z06s with a defective "track-proven" powertrain system;

g)      Whether GM's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

h)      Whether GM knew or should have known that the defects existed with regard to the Z06;

i)      Whether GM knew or reasonably should have known of the defects in the Z06 before it sold or leased them to Class members;

j)      Whether Plaintiffs and the other Class members overpaid for their Z06s as a result of the defects alleged herein;

k)      Whether Plaintiffs and the other Class members are entitled to equitable relief; and

l)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

121.    <u>Typicality</u>: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs'

claims are typical of the other Class members' claims because, among other things,

- 62 -

all Class members were comparably injured through GM's wrongful conduct as described above.

122. <u>Adequacy</u>: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes each respectively seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

123. <u>Declaratory and Injunctive Relief</u>: Federal Rule of Civil Procedure 23(b)(2): GM has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

124. <u>Superiority</u>: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM, so it would be impracticable for Class members to individually seek

- 63 -

redress for GM's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CLAIMS FOR RELIEF

**A.    Claims Brought on Behalf of the Nationwide Class**

### COUNT ONE

### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301 *ET SEQ.*)

125.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

126.   Plaintiffs bring this Count on behalf of the Nationwide Class.

127.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

128.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

129.   The Z06 is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

- 64 -

130.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

131.    GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

132.    GM breached these warranties as described in more detail above. Without limitation, the Z06 is equipped with a defective "track-proven" powertrain system. The Z06s share a common design defect in that the system fails to operate as represented by GM.

133.    Plaintiffs and the other Nationwide Class members have had sufficient direct dealings with either GM or its agents to establish privity of contract between GM on one hand and Plaintiffs and each of the other Class members on the other hand. GM-authorized dealerships and technical support organizations operating under contract to GM are agents of GM. Nonetheless, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between GM and its dealers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the consumers only.

- 65 -

134.    Giving GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Plaintiffs have already done so and GM has failed, after numerous attempts, to cure the defects. As explained above, any solution offered by GM must be exclusively paid for by Plaintiffs and Nationwide Class members, which is a violation of GM's promise to repair and replace without charge. All solutions offered by GM are also aftermarket alterations; undertaking these repairs may represent a new violation of the express warranties on the part of Plaintiffs and Nationwide Class members. At the time of sale or lease of each Z06, GM knew, should have known, or was reckless in not knowing, of its omissions and/or misrepresentations concerning the Z06's inability to perform as warranted, but it nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or give GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

135.    Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their Z06s but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation

- 66 -

of acceptance and return immediately any payments made, Plaintiffs and the other
Nationwide Class members have not re-accepted their Z06s by retaining them.

136.   The amount in controversy of Plaintiffs' individual claims meets or
exceeds the sum of $25. The amount in controversy of this action exceeds the sum
of $50,000, exclusive of interest and costs, computed on the basis of all claims to
be determined in this lawsuit.

137.   Plaintiffs, individually and on behalf of the other Nationwide Class
members, seek all damages permitted by law, including diminution in value of the
Z06s and/or loss of the benefit of the bargain, in an amount to be proven at trial.

**B.     Claims Brought on Behalf of the Colorado Class by Plaintiff Matanky**

**COUNT TWO**

**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
(COLO. REV. STAT. § 6-1-101 *ET SEQ.*)**

138.   Plaintiff Matanky for all Colorado state claims ("Plaintiff") hereby
incorporates by reference the allegations contained in the preceding paragraphs of
this complaint.

139.   This claim is brought by Plaintiff on behalf of the Colorado Class.

140.   The Colorado Consumer Protection Act (Colorado CPA) prohibits
deceptive practices in the course of a person's business including, but not limited
to, "mak[ing] false or misleading statements of fact concerning the price of goods,
services, or property or the reasons for, existence of, or amounts of price

- 67 -

reductions"; and "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. § 6-1-105.

141.   Defendant is a "person" under COLO. REV. STAT. § 6-1-102(6).

142.   Plaintiff and Class members are "consumers" for purposes of COLO. REV. STAT. § 6-1-113(1)(a).

143.   Defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

144.   Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiff and Class members seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff or Class member.

145.   Plaintiff also seeks an order enjoining Defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

- 68 -

## COUNT THREE

## FRAUDULENT CONCEALMENT
## (BASED ON COLORADO LAW)

146.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

147.    Plaintiff brings this claim on behalf of the Colorado Class.

148.    GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby racing Z06s. GM concealed the fact that the only way for the Z06s to become "track-proven" as advertised was for GM owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

149.    GM further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Z06s it was selling had no significant defects and that all Z06s were "track-proven."

150.    GM knew about the defects in the "track-proven" powertrain system when these representations were made.

- 69 -

151. The Z06s purchased by Plaintiff and the other Colorado Class members contained a defective "track-proven" powertrain system.

152. GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Colorado Class members relied on GM's material representations.

153. As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that Colorado Class members would be required to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

154. The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiff and the other Colorado Class members did not know of these facts and GM actively concealed these facts from Plaintiff and the other Colorado Class members.

010687-11 1014581 V1

155.    Plaintiff and the other Colorado Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Colorado Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiff and the other Colorado Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

156.    GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the Z06s and forced Colorado Class members to make additional expenditures to ensure proper safety at the race track.

157.    GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiff or Colorado Class members.

158.    GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

- 71 -

159.   GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiff and the other Colorado Class members.

160.   GM has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Colorado Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

161.   Plaintiff and the other Colorado Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Colorado Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or Colorado Class members.

162.   Because of the concealment and/or suppression of facts, Plaintiff and the other Colorado Class members sustained damage because they own(ed) Z06s that are diminished in value as a result of GM's concealment of the true quality of the Z06's "track-proven" powertrain systems. Had Plaintiff and the other Colorado

- 72 -

Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiff and the other Colorado Class members who purchased a Z06 would have paid less for their Z06s or would not have purchased them at all.

163.   Plaintiff has been deprived of the benefit of his bargain and the value of Plaintiff's and the other Colorado Class members' Z06s has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the Z06s.

164.   Accordingly, GM is liable to Plaintiff and the other Colorado Class members for damages in an amount to be proven at trial.

165.   GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Colorado Class members' rights and the representations that GM made to them, in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

- 73 -

## COUNT FOUR

## BREACH OF EXPRESS WARRANTY
### (COLO. REV. STAT. § 4-2-313 and § 4-2.5-210)

166.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

167.   Plaintiff brings this claim on behalf of the Colorado Class.

168.   GM was at all relevant times a "merchant" with respect to motor vehicles under COLO. REV. STAT. § 4-2-104(1) and 4.2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

169.   The Z06s are and were at all relevant times "goods" within the meaning of COLO. REV. STAT. § 4-2-104(1) and 4.2.5-103(3).

170.   As an express warrantor and manufacturer and merchant, GM had certain obligations to conform the Z06s to the express warranties.

171.   When Plaintiff and the other Class members purchased or leased their Z06s, GM expressly warranted in writing that the Z06s were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. GM expressly warranted that at "no charge" it will repair "any vehicle defect." GM breached its warranty obligations by selling inherently defective Z06s.

172.   The defects at issue in this litigation were present at the time of sale and lease to Plaintiff and members of the Class.

- 74 -

173.   GM breached the Limited Warranty to repair and adjust, or to correct defects in the design, materials and workmanship of, any part supplied by GM as GM has been unable to repair or adjust the Z06's design, materials and workmanship defects.

174.   Furthermore, the Limited Warranty of repair and/or adjustments to effective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

175.   Pursuant to the express warranties, GM was obligated to pay for or reimburse Plaintiff and the other Class members for costs incurred in purchasing aftermarket coolers for the transmission and differential systems and other costs associated with bringing their Z06s to the dealership for futile repair efforts. GM was also obligated to repair the defects.

176.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Class members seek all remedies as allowed by law.

177.   Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's

- 75 -

Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiff and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

178.   GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

179.   Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

180.   GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received, on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

181.   Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

182.   Plaintiff has had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiff and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

183.   As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

## COUNT FIVE

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (COL. REV. STAT. §§ 4-2-313 AND 4-2.5-212)

184.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

010687-11 1014581 V1

185.    Plaintiff brings this Count on behalf of the Colorado Class.

186.    GM was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

187.    The Z06s are and were at all relevant times "goods" within the of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

188.    A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. § § 4-2-313 and 4-2.5-212.

189.    These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety, reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

190.    GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

- 78 -

191.   GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiff's counsel as referenced elsewhere in the Complaint, and by numerous individual letters and communications sent by Plaintiff and other Colorado Class members before or within a reasonable amount of time.

192.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Colorado Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## COUNT SIX

### UNJUST ENRICHMENT
### (BASED ON COLORADO LAW)

193.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

194.   This claim is brought by Plaintiff on behalf of the Colorado Class.

195.   GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein. GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Class members.

196.   GM has voluntarily accepted and retained this benefit.

197.   The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Class members.

198.   Plaintiff and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**C.    Claims Brought on Behalf of the Connecticut Class by Plaintiffs Franklin and Dufresne**

### COUNT SEVEN

### VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
### (CONN. GEN. STAT. § 42-110A *ET SEQ.*)

199.   Plaintiffs Franklin and Dufresne for the Connecticut state claims ("Plaintiffs") hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

200.   This claim is brought by Plaintiffs on behalf of the Connecticut Class.

201.   The Connecticut Unfair Trade Practices Act (Connecticut UTPA) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. § 42-110b(a).

202.   Defendant is a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3).

- 80 -

203.   Defendant's challenged conduct occurred in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

204.   Plaintiffs and Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

205.   Defendant acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

## COUNT EIGHT

## FRAUDULENT CONCEALMENT
## (BASED ON CONNECTICUT LAW)

206.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

207.   Plaintiffs bring this claim on behalf of the Connecticut Class.

208.   GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby racing Z06s. GM concealed the fact that the only way for the Z06s to become "track-proven" as

- 81 -

advertised was for GM owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

209.   GM further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Z06s it was selling had no significant defects and that all Z06s were "track-proven."

210.   GM knew about the defects in the "track-proven" powertrain system when these representations were made.

211.   The Z06s purchased by Plaintiffs and the other Connecticut Class members contained a defective "track-proven" powertrain system.

212.   GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiffs and the other Connecticut Class members relied on GM's material representations.

213.   As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that Connecticut Class members would be required

- 82 -

to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

214.   The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiffs and the other Connecticut Class members did not know of these facts and GM actively concealed these facts from Plaintiffs and the other Connecticut Class members.

215.   Plaintiffs and the other Connecticut Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiffs and the other Connecticut Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiffs and the other Connecticut Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

216.   GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the Z06s and forced Connecticut Class members to make additional expenditures to ensure proper safety at the race track.

- 83 -

217.   GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiffs or Connecticut Class members.

218.   GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

219.   GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiffs and the other Connecticut Class members.

220.   GM has still not made full and adequate disclosures and continues to defraud Plaintiffs and the other Connecticut Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

221.   Plaintiffs and the other Connecticut Class members were unaware of the omitted material facts referenced herein and they would not have acted as they

- 84 -

did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the other Connecticut Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Connecticut Class members.

222.   Because of the concealment and/or suppression of facts, Plaintiffs and the other Connecticut Class members sustained damage because they own(ed) Z06s that are diminished in value as a result of GM's concealment of the true quality of the Z06's "track-proven" powertrain systems. Had Plaintiffs and the other Connecticut Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiffs and the other Connecticut Class members who purchased a Z06 would have paid less for their Z06s or would not have purchased them at all.

223.   Plaintiffs have been deprived of the benefit of the bargain and the value of Plaintiffs' and the other Connecticut Class members' Z06s has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the Z06s.

224.    Accordingly, GM is liable to Plaintiffs and the other Connecticut

Class members for damages in an amount to be proven at trial.

225.    GM's acts were done wantonly, maliciously, oppressively,

deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the

other Connecticut Class members' rights and the representations that GM made to

them, in order to enrich GM. GM's conduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future, which amount

is to be determined according to proof.

## COUNT NINE

### BREACH OF EXPRESS WARRANTY
### (CONN. GEN. STAT. ANN § 42A-2-313)

226.    Plaintiffs hereby incorporate by reference the allegations contained in

the preceding paragraphs of this complaint.

227.    Plaintiffs brings this claim on behalf of the Connecticut Class.

228.    GM was at all relevant times a "merchant" with respect to motor

vehicles under CONN. GEN. STAT. ANN. § 442a-2-104(1).

229.    As an express warrantor and manufacturer and merchant, GM had

certain obligations to conform the Z06s to the express warranties.

230.    When Plaintiffs and the other Class members purchased or leased

their Z06s, GM expressly warranted in writing that the Z06s were covered by a

- 86 -

Limited Warranty and that the Limited Warranty formed the basis of the bargain. GM expressly warranted that at "no charge" it will repair "any vehicle defect." GM breached its warranty obligations by selling inherently defective Z06s.

231.   The defects at issue in this litigation were present at the time of sale and lease to Plaintiffs and members of the Class.

232.   GM breached the Limited Warranty to repair and adjust, or to correct defects in the design, materials and workmanship of, any part supplied by GM as GM has been unable to repair or adjust the Z06's design, materials and workmanship defects.

233.   Furthermore, the Limited Warranty of repair and/or adjustments to effective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

234.   Pursuant to the express warranties, GM was obligated to pay for or reimburse Plaintiffs and the other Class members for costs incurred in purchasing aftermarket coolers for the transmission and differential systems and other costs associated with bringing their Z06s to the dealership for futile repair efforts. GM was also obligated to repair the defects.

- 87 -

235. Accordingly, recovery by Plaintiffs and the other Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs and the other Class members seek all remedies as allowed by law.

236. Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiffs and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

237. GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

238. Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to the GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

- 88 -

239.   GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received, on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

240.   Plaintiffs have performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

241.   Plaintiffs have had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiffs and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiffs and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

- 89 -

242.   As a direct and proximate result of GM's breach of express warranty, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

## COUNT TEN

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (CONN. GEN. STAT. ANN. § 42A-2-314)

243.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

244.   Plaintiffs bring this Count on behalf of the Connecticut Class.

245.   GM was at all relevant times a "merchant" with respect to motor with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

246.   A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.

247.   These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety,

- 90 -

reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

248.   GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

249.   GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiffs' counsel as referenced elsewhere in the Complaint, and by numerous individual letters and communications sent by Plaintiffs and other Connecticut Class members before or within a reasonable amount of time.

250.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the other Connecticut Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## COUNT ELEVEN

### UNJUST ENRICHMENT
### (BASED ON CONNECTICUT LAW)

251.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

252.   This claim is brought by Plaintiffs on behalf of the Connecticut Class.

253.   GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein.

- 91 -

GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

254.   GM has voluntarily accepted and retained this benefit.

255.   The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

256.   Plaintiffs and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**D.    Claims Brought on Behalf of the Georgia Class by Plaintiff Grant**

**COUNT TWELVE**

**VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390 *ET SEQ.*)**

257.   Plaintiff Grant for all Georgia state claims ("Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

258.   This claim is brought by Plaintiff on behalf of the Georgia Class.

259.   The Georgia Fair Business Practices Act (Georgia FBPA) declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE ANN. § 101-393(b), including, but not limited to, "representing that goods or services

- 92 -

have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," GA. CODE ANN. § 10-1-393(b).

260.   Plaintiff and Class members are "consumers" within the meaning of GA. CODE ANN. § 10-1-393(b).

261.   Defendant engaged in "trade or commerce" within the meaning of GA. CODE ANN. § 10-1-393(b).

262.   Plaintiff and Class members are entitled to recover damages and exemplary damages (for intentional violations) per GA. CODE ANN. § 10-1-399(a).

263.   Plaintiff also seeks an order enjoining Defendant unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA. CODE ANN. § 10-1-399.

264.   On February 14, 2018, Plaintiff sent a letter complying with GA. CODE ANN. § 10-1-399(b) to Defendant.

## COUNT THIRTEEN

### VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (GA. CODE ANN. § 10-1-370 *ET SEQ.*)

265.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

- 93 -

266.   This claim is brought by Plaintiff on behalf of the Georgia Class.

267.   Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include "[m]ak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "any other conduct which similarly creates a likelihood of confusion or of misunderstanding." GA. CODE ANN. § 10-1-372(a).

268.   Defendant, Plaintiff, and Class members are "persons" within the meaning of GA. CODE ANN. § 10-1-371(5).

269.   Plaintiff seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under GA. CODE ANN. § 10-1-373.

## COUNT FOURTEEN

### FRAUDULENT CONCEALMENT
### (BASED ON GEORGIA LAW)

270.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

271.   Plaintiff brings this claim on behalf of the Georgia Class.

272.   GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a

- 94 -

dangerous hazard not only to the drivers but also to nearby racing Z06s. GM concealed the fact that the only way for the Z06s to become "track-proven" as advertised was for GM owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

273.    GM further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Z06s it was selling had no significant defects and that all Z06s were "track-proven."

274.    GM knew about the defects in the "track-proven" powertrain system when these representations were made.

275.    The Z06s purchased by Plaintiff and the other Georgia Class members contained a defective "track-proven" powertrain system.

276.    GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Georgia Class members relied on GM's material representations.

277.    As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the

- 95 -

"track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that Georgia Class members would be required to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

278.   The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiff and the other Georgia Class members did not know of these facts and GM actively concealed these facts from Plaintiff and the other Georgia Class members.

279.   Plaintiff and the other Georgia Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Georgia Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiff and the other Georgia Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

280.   GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the Z06s and forced Georgia Class members to make additional expenditures to ensure proper safety at the race track.

- 96 -

281.   GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiff or Georgia Class members.

282.   GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

283.   GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiff and the other Georgia Class members.

284.   GM has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Georgia Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

285.   Plaintiff and the other Georgia Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not

- 97 -

have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Georgia Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or Georgia Class members.

286.   Because of the concealment and/or suppression of facts, Plaintiff and the other Georgia Class members sustained damage because they own(ed) Z06s that are diminished in value as a result of GM's concealment of the true quality of the Z06's "track-proven" powertrain systems. Had Plaintiff and the other Georgia Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiff and the other Georgia Class members who purchased a Z06 would have paid less for their Z06s or would not have purchased them at all.

287.   Plaintiff has been deprived of the benefit of his bargain and the value of Plaintiff's and the other Georgia Class members' Z06s has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the Z06s.

- 98 -

288.    Accordingly, GM is liable to Plaintiff and the other Georgia Class members for damages in an amount to be proven at trial.

289.    GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Georgia Class members' rights and the representations that GM made to them, in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FIFTEEN

### BREACH OF EXPRESS WARRANTY
### (GA. CODE ANN. §§ 11-2-313 AND 11-2A-210)

290.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

291.    Plaintiff brings this claim on behalf of the Georgia Class.

292.    GM was at all relevant times a "merchant" with respect to motor vehicles under GA. CODE ANN. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles under § 11-2-103(1)(d).

293.    The Z06s are and were at all relevant times "goods" within the meaning of GA. CODE ANN. § 11-2-105(1) and 11-2A-103(1)(h).

294.    As an express warrantor and manufacturer and merchant, GM had certain obligations to conform the Z06s to the express warranties.

- 99 -

295.    When Plaintiff and the other Class members purchased or leased their Z06s, GM expressly warranted in writing that the Z06s were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. GM expressly warranted that at "no charge" it will repair "any vehicle defect." GM breached its warranty obligations by selling inherently defective Z06s.

296.    The defects at issue in this litigation were present at the time of sale and lease to Plaintiff and members of the Class.

297.    GM breached the Limited Warranty to repair and adjust, or to correct defects in the design, materials and workmanship of, any part supplied by GM as GM has been unable to repair or adjust the Z06's design, materials and workmanship defects.

298.    Furthermore, the Limited Warranty of repair and/or adjustments to effective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

299.    Pursuant to the express warranties, GM was obligated to pay for or reimburse Plaintiff and the other Class members for costs incurred in purchasing aftermarket coolers for the transmission and differential systems and other costs

associated with bringing their Z06s to the dealership for futile repair efforts. GM was also obligated to repair the defects.

300.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Class members seek all remedies as allowed by law.

301.    Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiff and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

302.    GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

303.    Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to the GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on

- 101 -

Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

304.    GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received, on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

305.    Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

306.    Plaintiff has had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiff and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the

warranty agreements were designed for and intended to benefit the ultimate consumers only.

307.   As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

## COUNT SIXTEEN

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (GA. CODE. ANN. §§ 11-2-314 AND 11-2A-212)

308.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

309.   Plaintiff brings this Count on behalf of the Georgia Class.

310.   GM was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

311.   The Z06s are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

312.   A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

313.   These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are

- 103 -

used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety, reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

314.   GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

315.   GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiff's counsel as referenced elsewhere in the Complaint, and by numerous individual letters and communications sent by Plaintiff and other Georgia Class members before or within a reasonable amount of time.

316.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Georgia Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## COUNT SEVENTEEN

## UNJUST ENRICHMENT
## (BASED ON GEORGIA LAW)

317.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

318.   This claim is brought by Plaintiff on behalf of the Georgia Class.

319.   GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein. GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Class members.

320.   GM has voluntarily accepted and retained this benefit.

321.   The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Class members.

322.   Plaintiff and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

- 105 -

**E.    Claims Brought on Behalf of the Kansas Class by Plaintiff Zachacz**

## COUNT EIGHTEEN

### VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### (KAN. STAT. ANN. § 50-623 *ET SEQ.*)

323.    Plaintiff Zachacz for all Kansas state law claims ("Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

324.    This claim is brought by Plaintiff on behalf of the Kansas Class.

325.    The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." KAN. STAT. ANN. § 50-626(a). Deceptive acts or practices include, but are not limited to, "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"; "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions," "whether or not any consumer has in fact been misled." KAN. STAT. ANN. § 50-626.

326.    Plaintiff and Class members are "consumers" within the meaning of KAN. STAT. ANN. § 50-624(b), who purchased the vehicles at issue.

- 106 -

327.   Each sale of the Corvette Z06 to Plaintiff and Class members was a "consumer transaction" within the meaning of KAN. STAT. ANN. § 50-624(c).

328.   Pursuant to KAN. STAT. ANN. § 50-634, Plaintiff and Class members seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

329.   Plaintiff also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN. § 50-623 *et seq.*

### COUNT NINETEEN

### FRAUDULENT CONCEALMENT
### (BASED ON KANSAS LAW)

330.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

331.   Plaintiff brings this claim on behalf of the Kansas Class.

332.   GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby racing Z06s. GM concealed the fact that the only way for the Z06s to become "track-proven" as

- 107 -

advertised was for GM owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

333.   GM further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Z06s it was selling had no significant defects and that all Z06s were "track-proven."

334.   GM knew about the defects in the "track-proven" powertrain system when these representations were made.

335.   The Z06s purchased by Plaintiff and the other Kansas Class members contained a defective "track-proven" powertrain system.

336.   GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Kansas Class members relied on GM's material representations.

337.   As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that Kansas Class members would be required to

- 108 -

make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

338.   The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiff and the other Kansas Class members did not know of these facts and GM actively concealed these facts from Plaintiff and the other Kansas Class members.

339.   Plaintiff and the other Kansas Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Kansas Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiff and the other Kansas Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

340.   GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the Z06s and forced Kansas Class members to make additional expenditures to ensure proper safety at the race track.

341.   GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the

- 109 -

true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiff or Kansas Class members.

342.    GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

343.    GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiff and the other Kansas Class members.

344.    GM has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Kansas Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

345.    Plaintiff and the other Kansas Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from

them. Plaintiff's and the other Kansas Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or Kansas Class members.

346.   Because of the concealment and/or suppression of facts, Plaintiff and the other Kansas Class members sustained damage because they own(ed) Z06s that are diminished in value as a result of GM's concealment of the true quality of the Z06's "track-proven" powertrain systems. Had Plaintiff and the other Kansas Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiff and the other Kansas Class members who purchased a Z06 would have paid less for their Z06s or would not have purchased them at all.

347.   Plaintiff has been deprived of the benefit of his bargain and the value of Plaintiff's and the other Kansas Class members' Z06s has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the Z06s.

348.   Accordingly, GM is liable to Plaintiff and the other Kansas Class members for damages in an amount to be proven at trial.

349.    GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Kansas Class members' rights and the representations that GM made to them, in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT TWENTY

### BREACH OF EXPRESS WARRANTY
### (KAN. STAT. ANN. §§ 84-2-314 AND 84-2A-210)

350.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

351.    Plaintiff brings this claim on behalf of the Kansas Class.

352.    GM was at all relevant times a "merchant" with respect to motor vehicles under KAN. STAT. ANN. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

353.    The Z06s are and were at all relevant times "goods" within the meaning of KAN. STAT. ANN. §§ 84-2-105(1) and 84-2A-103(1)(h).

354.    As an express warrantor and manufacturer and merchant, GM had certain obligations to conform the Z06s to the express warranties.

355.    When Plaintiff and the other Class members purchased or leased their Z06s, GM expressly warranted in writing that the Z06s were covered by a Limited

- 112 -

Warranty and that the Limited Warranty formed the basis of the bargain. GM expressly warranted that at "no charge" it will repair "any vehicle defect." GM breached its warranty obligations by selling inherently defective Z06s.

356.    The defects at issue in this litigation were present at the time of sale and lease to Plaintiff and members of the Class.

357.    GM breached the Limited Warranty to repair and adjust, or to correct defects in the design, materials and workmanship of, any part supplied by GM as GM has been unable to repair or adjust the Z06's design, materials and workmanship defects.

358.    Furthermore, the Limited Warranty of repair and/or adjustments to effective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

359.    Pursuant to the express warranties, GM was obligated to pay for or reimburse Plaintiff and the other Class members for costs incurred in purchasing aftermarket coolers for the transmission and differential systems and other costs associated with bringing their Z06s to the dealership for futile repair efforts. GM was also obligated to repair the defects.

010687-11 1014581 V1

360.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Class members seek all remedies as allowed by law.

361.    Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiff and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

362.    GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

363.    Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to the GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

- 114 -

364.   GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received, on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

365.   Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

366.   Plaintiff has had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiff and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

- 115 -

367.   As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

## COUNT TWENTY-ONE

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (KAN. STAT. §§ 84-2-314 AND 84-2A-212)

368.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

369.   Plaintiff brings this Count on behalf of the Kansas Class.

370.   GM was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

371.   The Z06s are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

372.   A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

373.   These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain

- 116 -

system and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety, reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

374. GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

375. GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiff's counsel as referenced elsewhere in the Complaint, and by numerous individual letters and communications sent by Plaintiff and other Kansas Class members before or within a reasonable amount of time.

376. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Kansas Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## COUNT TWENTY-TWO

## UNJUST ENRICHMENT
## (BASED ON KANSAS LAW)

377. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

378. This claim is brought by Plaintiff on behalf of the Kansas Class.

- 117 -

379.   GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein. GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Class members.

380.   GM has voluntarily accepted and retained this benefit.

381.   The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Class members.

382.   Plaintiff and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**F.    Claims Brought on Behalf of the Michigan Class by Plaintiff Linderman**

### COUNT TWENTY-THREE

### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### (MICH. COMP. LAWS § 445.903 *ET SEQ.*)

383.   Plaintiff Linderman for all Michigan state claims ("Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

384.   This claim is brought by Plaintiff on behalf of the Michigan Class.

385.   The Michigan Consumer Protection Act (Michigan CPA) prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct

- 118 -

of trade or commerce," including "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).

386.   Plaintiff and Class members are "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

387.   Defendant is a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

388.   Plaintiff seeks injunctive relief to enjoin Defendant from continuing its unfair and deceptive acts; monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys'

- 119 -

fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

389.   Plaintiff also seeks punitive damages against Defendant because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff to cruel and unjust hardship as a result. Defendant intentionally and willfully misrepresented the safety and reliability of Corvette Z06s, deceived Plaintiff on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a dangerous flaw in the Z06s it repeatedly promised Plaintiff were safe. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT TWENTY-FOUR

### FRAUDULENT CONCEALMENT
### (BASED ON MICHIGAN LAW)

390.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

391.   Plaintiff brings this claim on behalf of the Michigan Class.

392.   GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a

- 120 -

dangerous hazard not only to the drivers but also to nearby racing Z06s. GM concealed the fact that the only way for the Z06s to become "track-proven" as advertised was for GM owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

393.    GM further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Z06s it was selling had no significant defects and that all Z06s were "track-proven."

394.    GM knew about the defects in the "track-proven" powertrain system when these representations were made.

395.    The Z06s purchased by Plaintiff and the other Michigan Class members contained a defective "track-proven" powertrain system.

396.    GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Michigan Class members relied on GM's material representations.

397.    As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the

- 121 -

"track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that Michigan Class members would be required to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

398.   The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiff and the other Michigan Class members did not know of these facts and GM actively concealed these facts from Plaintiff and the other Michigan Class members.

399.   Plaintiff and the other Michigan Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Michigan Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiff and the other Michigan Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

400.   GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that

- 122 -

played a significant role in the value of the Z06s and forced Michigan Class members to make additional expenditures to ensure proper safety at the race track.

401.   GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiff or Michigan Class members.

402.   GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

403.   GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiff and the other Michigan Class members.

404.   GM has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Michigan Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

405.    Plaintiff and the other Michigan Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Michigan Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or Michigan Class members.

406.    Because of the concealment and/or suppression of facts, Plaintiff and the other Michigan Class members sustained damage because they own(ed) Z06s that are diminished in value as a result of GM's concealment of the true quality of the Z06's "track-proven" powertrain systems. Had Plaintiff and the other Michigan Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiff and the other Michigan Class members who purchased a Z06 would have paid less for their Z06s or would not have purchased them at all.

407.    Plaintiff has been deprived of the benefit of his bargain and the value of Plaintiff's and the other Michigan Class members' Z06s has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to

- 124 -

purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the Z06s.

408.   Accordingly, GM is liable to Plaintiff and the other Michigan Class members for damages in an amount to be proven at trial.

409.   GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Michigan Class members' rights and the representations that GM made to them, in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT TWENTY-FIVE

### BREACH OF EXPRESS WARRANTY
### (MICH. COMP. LAWS  §§ 440.2313 AND 440.2860)

410.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

411.   Plaintiff brings this claim on behalf of the Michigan Class.

412.   GM was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS §§ 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(c).

413.   The Z06s are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

- 125 -

414.    As an express warrantor and manufacturer and merchant, GM had certain obligations to conform the Z06s to the express warranties.

415.    When Plaintiff and the other Class members purchased or leased their Z06s, GM expressly warranted in writing that the Z06s were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. GM expressly warranted that at "no charge" it will repair "any vehicle defect." GM breached its warranty obligations by selling inherently defective Z06s.

416.    The defects at issue in this litigation were present at the time of sale and lease to Plaintiff and members of the Class.

417.    GM breached the Limited Warranty to repair and adjust, or to correct defects in the design, materials and workmanship of, any part supplied by GM as GM has been unable to repair or adjust the Z06's design, materials and workmanship defects.

418.    Furthermore, the Limited Warranty of repair and/or adjustments to effective parts fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

419.    Pursuant to the express warranties, GM was obligated to pay for or reimburse Plaintiff and the other Class members for costs incurred in purchasing

aftermarket coolers for the transmission and differential systems and other costs associated with bringing their Z06s to the dealership for futile repair efforts. GM was also obligated to repair the defects.

420. Accordingly, recovery by Plaintiff and the other Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Class members seek all remedies as allowed by law.

421. Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiff and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

422. GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

423. Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to the GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure

- 127 -

to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

424.   GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received, on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

425.   Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

426.   Plaintiff has had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiff and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the

warranty agreements were designed for and intended to benefit the ultimate consumers only.

427.    As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

## COUNT TWENTY-SIX

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MICH. COMP. LAWS §§ 440.2314 AND 440.2860)

428.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

429.    Plaintiff brings this Count on behalf of the Michigan Class.

430.    GM was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS § 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(d).

431.    The Z06s are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

432.    A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to MICH. COMP. LAWS §§  440.2314 and 440.2862.

433.    These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are

- 129 -

used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety, reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

434.   GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

435.   GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiff's counsel as referenced elsewhere in the Complaint, and by numerous individual letters and communications sent by Plaintiff and other Michigan Class members before or within a reasonable amount of time.

436.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Michigan Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

010687-11 1014581 V1

## COUNT TWENTY-SEVEN

### UNJUST ENRICHMENT
### (BASED ON MICHIGAN LAW)

437.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

438.   This claim is brought by Plaintiff on behalf of the Michigan Class.

439.   GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein. GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Class members.

440.   GM has voluntarily accepted and retained this benefit.

441.   The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Class members.

442.   Plaintiff and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

- 131 -

**G.**    **Claims Brought on Behalf of the Missouri Class by Plaintiff Closser**

**COUNT TWENTY-EIGHT**

**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
(MO. REV. STAT. § 407.010 *ET SEQ.*)**

443.   Plaintiff Closser for all Missouri state law claims ("Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

444.   This claim is brought by Plaintiff on behalf of the Missouri Class.

445.   The Missouri Merchandising Practices Act (Missouri MPA) makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020.

446.   Defendant, Plaintiff, and Class members are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

447.   Defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

448.   Defendant is liable to Plaintiff and Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendant's unfair and deceptive practices, and any other just and proper relief under MO. REV. STAT. § 407.025.

## COUNT TWENTY-NINE

## FRAUDULENT CONCEALMENT
### (BASED ON MISSOURI LAW)

449.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

450.   Plaintiff brings this claim on behalf of the Missouri Class.

451.   GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby racing Z06s. GM concealed the fact that the only way for the Z06s to become "track-proven" as advertised was for GM owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

452.   GM further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Z06s it was selling had no significant defects and that all Z06s were "track-proven."

453.   GM knew about the defects in the "track-proven" powertrain system when these representations were made.

- 133 -

454.   The Z06s purchased by Plaintiff and the other Missouri Class members contained a defective "track-proven" powertrain system.

455.   GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Missouri Class members relied on GM's material representations.

456.   As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that Missouri Class members would be required to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

457.   The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiff and the other Missouri Class members did not know of these facts and GM actively concealed these facts from Plaintiff and the other Missouri Class members.

- 134 -

458.    Plaintiff and the other Missouri Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Missouri Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiff and the other Missouri Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

459.    GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the Z06s and forced Missouri Class members to make additional expenditures to ensure proper safety at the race track.

460.    GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiff or Missouri Class members.

461.    GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

462.   GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiff and the other Missouri Class members.

463.   GM has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Missouri Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

464.   Plaintiff and the other Missouri Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Missouri Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or Missouri Class members.

465.   Because of the concealment and/or suppression of facts, Plaintiff and the other Missouri Class members sustained damage because they own(ed) Z06s that are diminished in value as a result of GM's concealment of the true quality of the Z06's "track-proven" powertrain systems. Had Plaintiff and the other Missouri

- 136 -

Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiff and the other Missouri Class members who purchased a Z06 would have paid less for their Z06s or would not have purchased them at all.

466.   Plaintiff has been deprived of the benefit of his bargain and the value of Plaintiff's and the other Missouri Class members' Z06s has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the Z06s.

467.   Accordingly, GM is liable to Plaintiff and the other Missouri Class members for damages in an amount to be proven at trial.

468.   GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Missouri Class members' rights and the representations that GM made to them, in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT THIRTY

## BREACH OF EXPRESS WARRANTY
## (MO. REV. STAT. §§ 400.2-313 AND 400.2A-210)

469.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

470.    Plaintiff brings this claim on behalf of the Missouri Class.

471.    GM was at all relevant times a "merchant" with respect to motor vehicles under MO. REV. STAT. § 400.2-104(1), and "sellers" of motor vehicles under § 400.2-103(1)(d).

472.    The Z06s are and were at all relevant times "goods" within the meaning of MO. REV. STAT. § 400.2-105(1) and 400.2A-103(1)(h).

473.    As an express warrantor and manufacturer and merchant, GM had certain obligations to conform the Z06s to the express warranties.

474.    When Plaintiff and the other Class members purchased or leased their Z06s, GM expressly warranted in writing that the Z06s were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. GM expressly warranted that at "no charge" it will repair "any vehicle defect." GM breached its warranty obligations by selling inherently defective Z06s.

475.    The defects at issue in this litigation were present at the time of sale and lease to Plaintiff and members of the Class.

- 138 -

476. GM breached the Limited Warranty to repair and adjust, or to correct defects in the design, materials and workmanship of, any part supplied by GM as GM has been unable to repair or adjust the Z06's design, materials and workmanship defects.

477. Furthermore, the Limited Warranty of repair and/or adjustments to effective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

478. Pursuant to the express warranties, GM was obligated to pay for or reimburse Plaintiff and the other Class members for costs incurred in purchasing aftermarket coolers for the transmission and differential systems and other costs associated with bringing their Z06s to the dealership for futile repair efforts. GM was also obligated to repair the defects.

479. Accordingly, recovery by Plaintiff and the other Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Class members seek all remedies as allowed by law.

480. Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's

- 139 -

Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiff and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

481.   GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

482.   Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to the GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

483.   GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received, on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

- 140 -

484.   Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

485.   Plaintiff has had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiff and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

486.   As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

## COUNT THIRTY-ONE

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MO. REV. STAT. § 400.2-314)

487.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

- 141 -

488.   Plaintiff brings this Count on behalf of the Missouri Class.

489.   GM was at all relevant times a "merchant" as defined by Mo. Rev. Stat. § 400.2-104 and a "seller" of motor vehicles under § 400.2-103(1)(d).

490.   The Z06s are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

491.   A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314 and Mo. Stat. § 400.2A-212.

492.   These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety, reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

493.   GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

494.   GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiff's counsel as referenced elsewhere in

- 142 -

the Complaint, and by numerous individual letters and communications sent by Plaintiff and other Missouri Class members before or within a reasonable amount of time.

495.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Missouri Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## COUNT THIRTY-TWO

## UNJUST ENRICHMENT
## (BASED ON MISSOURI LAW)

496.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

497.   This claim is brought by Plaintiff on behalf of the Missouri Class.

498.   GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein. GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Class members.

499.   GM has voluntarily accepted and retained this benefit.

500.   The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Class members.

501.   Plaintiff and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**H.   Claims Brought on Behalf of the Nevada Class by Plaintiff DiIorio**

**COUNT THIRTY-THREE**

**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*)**

502.   Plaintiff DiIorio for all Nevada state law claims ("Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

503.   This claim is brought by Plaintiff on behalf of the Nevada Class.

504.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, *et seq*. prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5.  Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or

- 144 -

model"; "9.  Advertises goods or services with intent not to sell or lease them as advertised"; or "15.  Knowingly makes any other false representation in a transaction."

505.    Accordingly, Plaintiffs and the Nevada Class seek their actual damages, punitive damages, an order enjoining Volkswagen's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  NEV. REV. STAT. § 41.600.

## COUNT THIRTY-FOUR

### FRAUDULENT CONCEALMENT
### (BASED ON NEVADA LAW)

506.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

507.    Plaintiff brings this claim on behalf of the Nevada Class.

508.    GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby racing Z06s. GM concealed the fact that the only way for the Z06s to become "track-proven" as

- 145 -

advertised was for GM owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

509.  GM further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Z06s it was selling had no significant defects and that all Z06s were "track-proven."

510.  GM knew about the defects in the "track-proven" powertrain system when these representations were made.

511.  The Z06s purchased by Plaintiff and the other Nevada Class members contained a defective "track-proven" powertrain system.

512.  GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Nevada Class members relied on GM's material representations.

513.  As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that Nevada Class members would be required to

- 146 -

make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

514.    The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiff and the other Nevada Class members did not know of these facts and GM actively concealed these facts from Plaintiff and the other Nevada Class members.

515.    Plaintiff and the other Nevada Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Nevada Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiff and the other Nevada Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

516.    GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the Z06s and forced Nevada Class members to make additional expenditures to ensure proper safety at the race track.

517.    GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the

- 147 -

true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiff or Nevada Class members.

518.   GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

519.   GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiff and the other Nevada Class members.

520.   GM has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Nevada Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

521.   Plaintiff and the other Nevada Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from

- 148 -

them. Plaintiff's and the other Nevada Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or Nevada Class members.

522.   Because of the concealment and/or suppression of facts, Plaintiff and the other Nevada Class members sustained damage because they own(ed) Z06s that are diminished in value as a result of GM's concealment of the true quality of the Z06's "track-proven" powertrain systems. Had Plaintiff and the other Nevada Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiff and the other Nevada Class members who purchased a Z06 would have paid less for their Z06s or would not have purchased them at all.

523.   Plaintiff has been deprived of the benefit of his bargain and the value of Plaintiff's and the other Nevada Class members' Z06s has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the Z06s.

524.   Accordingly, GM is liable to Plaintiff and the other Nevada Class members for damages in an amount to be proven at trial.

525.   GM's acts were done wantonly, maliciously, oppressively,

deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the

other Nevada Class members' rights and the representations that GM made to

them, in order to enrich GM. GM's conduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future, which amount

is to be determined according to proof.

## COUNT THIRTY-FIVE

### BREACH OF EXPRESS WARRANTY
### (N.R.S. §§ 104.2313 AND 104A.2210)

526.   Plaintiff hereby incorporates by reference the allegations contained in

the preceding paragraphs of this complaint.

527.   Plaintiff brings this claim on behalf of the Nevada Class.

528.   GM was at all relevant times a "merchant" with respect to motor

vehicles under N.R.S. § 104.2104(1), and "sellers" of motor vehicles under

§ 104.2103(1)(c).

529.   The Z06s are and were at all relevant times "goods" within the

meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

530.   As an express warrantor and manufacturer and merchant, GM had

certain obligations to conform the Z06s to the express warranties.

531.   When Plaintiff and the other Class members purchased or leased their

Z06s, GM expressly warranted in writing that the Z06s were covered by a Limited

Warranty and that the Limited Warranty formed the basis of the bargain. GM expressly warranted that at "no charge" it will repair "any vehicle defect." GM breached its warranty obligations by selling inherently defective Z06s.

532.   The defects at issue in this litigation were present at the time of sale and lease to Plaintiff and members of the Class.

533.   GM breached the Limited Warranty to repair and adjust, or to correct defects in the design, materials and workmanship of, any part supplied by GM as GM has been unable to repair or adjust the Z06's design, materials and workmanship defects.

534.   Furthermore, the Limited Warranty of repair and/or adjustments to effective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

535.   Pursuant to the express warranties, GM was obligated to pay for or reimburse Plaintiff and the other Class members for costs incurred in purchasing aftermarket coolers for the transmission and differential systems and other costs associated with bringing their Z06s to the dealership for futile repair efforts. GM was also obligated to repair the defects.

536.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Class members seek all remedies as allowed by law.

537.    Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiff and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

538.    GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

539.    Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to the GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

- 152 -

540.   GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received, on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

541.   Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

542.   Plaintiff has had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiff and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

543.    As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

## COUNT THIRTY-SIX

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.R.S. §§ 104.2314 AND 104A.2212)

544.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

545.    Plaintiff brings this Count on behalf of the Nevada Class.

546.    GM was at all relevant times a "merchant" with respect to motor vehicles under N.R.S. § 104.2104(1) and a "seller" of motor vehicles under § 104.2103(1)(c).

547.    The Z06s are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

548.    A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.R.S. §§ 104.2314 and 104A.2212.

549.    These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain system

- 154 -

and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety, reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

550.   GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

551.   GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiff's counsel as referenced elsewhere in the Complaint, and by numerous individual letters and communications sent by Plaintiff and other Nevada Class members before or within a reasonable amount of time.

552.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Nevada Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## COUNT THIRTY-SEVEN

### UNJUST ENRICHMENT
### (BASED ON NEVADA LAW)

553.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

- 155 -

554.    This claim is brought by Plaintiff on behalf of the Nevada Class.

555.    GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein. GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Class members.

556.    GM has voluntarily accepted and retained this benefit.

557.    The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Class members.

558.    Plaintiff and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## I.    Claims Brought on Behalf of the Ohio Class by Plaintiff Bleich

### COUNT THIRTY-EIGHT

### VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT (MO. REV. STAT. § 1345.01 *ET SEQ.*)

559.    Plaintiff Bleich for all Ohio state claims hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

560.    This claim is brought by Plaintiff on behalf of the Ohio Class.

- 156 -

561.   Ohio Consumer Sales Practices Act (Ohio CSPA), OHIO REV. CODE ANN. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing that "a specific price advantage exists, if it does not." OHIO REV. CODE ANN. § 1345.02.

562.   Defendant is a "supplier" as that term is defined in OHIO REV. CODE ANN. § 1345.01(C).

563.   Plaintiff and Class members are "consumers" as that term is defined in OHIO REV. CODE ANN. § 1345.01(D), and their purchases of Z06 are "consumer transactions" within the meaning of OHIO REV. CODE ANN. § 1345.01(A).

564.   GM intentionally and knowingly misrepresented material facts regarding the Z06s with intent to mislead Plaintiff and the Ohio Class.

565.   GM knew or should have known that its conduct violated the Ohio CSPA.

566.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Volkswagen in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or

- 157 -

non-disclosure of a substantial defect, constitute deceptive sales practices in

violation of the CSPA.  These cases include, but are not limited to, the following:

a.    *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b.    *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

c.    *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d.    *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e.    *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f.    *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

g.    *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

h.    *Brown v. Spears* (OPIF #10000403);

i.    *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

j.    *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326); and

k.    *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

567.    As a result of the foregoing wrongful conduct, Plaintiff and Class

members have been damaged in an amount to be proven at trial, and seek all just

- 158 -

and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Defendant's deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to OHIO REV. CODE ANN. § 1345.09 *et seq.*

## COUNT THIRTY-NINE

## FRAUDULENT CONCEALMENT
## (BASED ON OHIO LAW)

568. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

569. Plaintiff brings this claim on behalf of the Ohio Class.

570. GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby racing Z06s. GM concealed the fact that the only way for the Z06s to become "track-proven" as advertised was for GM owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

571. GM further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material

- 159 -

provided with each car and on its website, that the Z06s it was selling had no significant defects and that all Z06s were "track-proven."

572.   GM knew about the defects in the "track-proven" powertrain system when these representations were made.

573.   The Z06s purchased by Plaintiff and the other Ohio Class members contained a defective "track-proven" powertrain system.

574.   GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Ohio Class members relied on GM's material representations.

575.   As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that Ohio Class members would be required to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

576.    The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiff and the other Ohio Class members did not know of these facts and GM actively concealed these facts from Plaintiff and the other Ohio Class members.

577.    Plaintiff and the other Ohio Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Ohioa Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiff and the other Ohio Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

578.    GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the Z06s and forced Ohio Class members to make additional expenditures to ensure proper safety at the race track.

579.    GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiff or Ohio Class members.

- 161 -

580.   GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

581.   GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiff and the other Ohio Class members.

582.   GM has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Ohio Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

583.   Plaintiff and the other Ohio Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Ohio Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or Ohio Class members.

- 162 -

584.   Because of the concealment and/or suppression of facts, Plaintiff and the other Ohio Class members sustained damage because they own(ed) Z06s that are diminished in value as a result of GM's concealment of the true quality of the Z06's "track-proven" powertrain systems. Had Plaintiff and the other Ohio Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiff and the other Ohio Class members who purchased a Z06 would have paid less for their Z06s or would not have purchased them at all.

585.   Plaintiff has been deprived of the benefit of his bargain and the value of Plaintiff's and the other Ohio Class members' Z06s has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the Z06s.

586.   Accordingly, GM is liable to Plaintiff and the other Ohio Class members for damages in an amount to be proven at trial.

587.   GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Ohio Class members' rights and the representations that GM made to them, in order to enrich GM. GM's conduct warrants an assessment of punitive damages

- 163 -

in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FORTY

### BREACH OF EXPRESS WARRANTY
### (OHIO REV. CODE ANN. § 1302.26, *et seq.*) (U.C.C. § 2-313)

588.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

589.    Plaintiff brings this claim on behalf of the Ohio Class.

590.    GM was at all relevant times a "merchant" with respect to motor vehicles under OHIO REV. CODE ANN. § 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

591.    The Z06s are and were at all relevant times "goods" within the meaning of OHIO REV. CODE ANN. §§ 1302.01(8) and 1310(A)(8).

592.    As an express warrantor and manufacturer and merchant, GM had certain obligations to conform the Z06s to the express warranties.

593.    When Plaintiff and the other Class members purchased or leased their Z06s, GM expressly warranted in writing that the Z06s were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. GM expressly warranted that at "no charge" it will repair "any vehicle defect." GM breached its warranty obligations by selling inherently defective Z06s.

- 164 -

594.   The defects at issue in this litigation were present at the time of sale and lease to Plaintiff and members of the Class.

595.   GM breached the Limited Warranty to repair and adjust, or to correct defects in the design, materials and workmanship of, any part supplied by GM as GM has been unable to repair or adjust the Z06's design, materials and workmanship defects.

596.   Furthermore, the Limited Warranty of repair and/or adjustments to effective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

597.   Pursuant to the express warranties, GM was obligated to pay for or reimburse Plaintiff and the other Class members for costs incurred in purchasing aftermarket coolers for the transmission and differential systems and other costs associated with bringing their Z06s to the dealership for futile repair efforts. GM was also obligated to repair the defects.

598.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Class members seek all remedies as allowed by law.

- 165 -

599.   Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiff and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

600.   GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

601.   Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to the GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

602.   GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received,

- 166 -

on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

603. Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

604. Plaintiff has had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiff and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

605. As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

- 167 -

## COUNT FORTY-ONE

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (OHIO REV. CODE ANN. §§ 1302.27 AND 1310.19)

606.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

607.    Plaintiff brings this Count on behalf of the Ohio Class.

608.    GM was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

609.    The Z06s are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8) and 1310.01(A)(8).

610.    A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.19.

611.    These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety,

- 168 -

reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

612.   GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

613.   GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiff's counsel as referenced elsewhere in the Complaint, and by numerous individual letters and communications sent by Plaintiff and other Ohio Class members before or within a reasonable amount of time.

614.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Ohio Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## COUNT FORTY-TWO

### UNJUST ENRICHMENT
### (BASED ON OHIO LAW)

615.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

616.   This claim is brought by Plaintiff on behalf the Ohio Class.

617.   GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein.

- 169 -

GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Class members.

618.    GM has voluntarily accepted and retained this benefit.

619.    The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Class members.

620.    Plaintiff and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**J.    Claims Brought on Behalf of the Pennsylvania Class by Plaintiff Nakel**

### COUNT FORTY-THREE

**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
(73 PA. CONS. STAT. § 201-1 *ET SEQ.*)**

621.    Plaintiff Nakel for all Pennsylvania state claims ("Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

622.    Plaintiff brings this claim on behalf of the Pennsylvania Class.

623.    Plaintiff and Pennsylvania Class members purchased or leased their Z06s primarily for personal, family or household purposes within the meaning of 73 PA. CONS. STAT. § 201-9.2.

624.    All of the acts complained of herein were perpetrated by GM in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

- 170 -

625.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have"; (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised"; and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 PA. CONS. STAT. § 201-2(4).

626.   In the course of business, GM willfully failed to disclose and actively concealed the "track-proven" powertrain system defects discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Z06s.

627.   By failing to disclose that defective "track-proven" vehicle, GM engaged in deceptive business practices in violation of the Pennsylvania CPL.

628.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Pennsylvania Class members, about the true value of the Z06s.

010687-11 1014581 V1

629.   GM intentionally and knowingly misrepresented material facts regarding the Z06s with intent to mislead Plaintiff and the Pennsylvania Class.

630.   GM knew or should have known that their conduct violated the Pennsylvania CPL.

631.   As alleged above, GM made material statements about the safety and performance of the Z06s and the GM brand that were either false or misleading.

632.   GM owed Plaintiff a duty to disclose the true performance, and reliability of the Z06s, because GM:

a.      Possessed exclusive knowledge that they were selling and distributing Z06s throughout the United States that did not perform as advertised;

b.      Intentionally concealed the foregoing from Plaintiff and the Pennsylvania Class; and/or

c.      Made incomplete representations about the safety and performance of the Z06s as set forth above, while purposefully withholding material facts from Plaintiff and the Pennsylvania Class that contradicted these representations.

633.   Because GM fraudulently concealed the defect in "track-proven" system and the Z06s inability to be used safely on a race track, Plaintiff was deprived of the benefit of the bargain and the value of the Z06s has greatly diminished. In light of the stigma attached to those Z06s by GM's conduct, they are now worth significantly less than they otherwise would be.

- 172 -

634.   GM's omissions and/or misrepresentations about the track performance and safety concerns of the Z06s are material to Plaintiff and the Pennsylvania Class.

635.   Plaintiff and Pennsylvania Class members suffered ascertainable loss caused by GM's misrepresentations and their concealment of and failure to disclose material information. Plaintiff and Pennsylvania Class members who purchased Z06s either would have paid less for their Z06s or would not have purchased or leased them at all but for GM's violations of the Pennsylvania CPL.

636.   GM had an ongoing duty to all GM customers to refrain from unfair and deceptive practices under the Pennsylvania CPL. All owners of Z06s suffered ascertainable loss in the form of the diminished value of their Z06s as a result of GM's deceptive and unfair acts and practices made in the course of GM's business.

637.   GM's violations present a continuing risk to Plaintiff as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

638.   As a direct and proximate result of GM's violations of the Pennsylvania CPL, Plaintiff and the Pennsylvania Class have suffered injury-in-fact and/or actual damage.

639.   GM is liable to Plaintiff and the Pennsylvania Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 PA.

- 173 -

CONS. STAT. § 201-9.2(a). Plaintiff and the Pennsylvania Class are also entitled to an award of punitive damages given that GM's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT FORTY-FOUR

### FRAUDULENT CONCEALMENT
### (BASED ON PENNSYLVANIA LAW)

640. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

641. Plaintiff brings this claim on behalf of the Pennsylvania Class.

642. GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby racing Z06s. GM concealed the fact that the only way for the Z06s to become "track-proven" as advertised was for GM owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

643. GM further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material

- 174 -

provided with each car and on its website, that the Z06s it was selling had no significant defects and that all Z06s were "track-proven."

644.   GM knew about the defects in the "track-proven" powertrain system when these representations were made.

645.   The Z06s purchased by Plaintiff and the other Pennsylvania Class members contained a defective "track-proven" powertrain system.

646.   GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Pennsylvania Class members relied on GM's material representations.

647.   As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that Pennsylvania Class members would be required to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

648.   The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiff and the other Pennsylvania Class members did not know of these facts and GM actively concealed these facts from Plaintiff and the other Pennsylvania Class members.

649.   Plaintiff and the other Pennsylvania Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Pennsylvania Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiff and the other Pennsylvania Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

650.   GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the Z06s and forced Pennsylvania Class members to make additional expenditures to ensure proper safety at the race track.

651.   GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were

- 176 -

not known to or reasonably discoverable by Plaintiff or Pennsylvania Class members.

652.   GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

653.   GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiff and the other Pennsylvania Class members.

654.   GM has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Pennsylvania Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

655.   Plaintiff and the other Pennsylvania Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Pennsylvania Class members' actions were justified.

GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or Pennsylvania Class members.

656.   Because of the concealment and/or suppression of facts, Plaintiff and the other Pennsylvania Class members sustained damage because they own(ed) Z06s that are diminished in value as a result of GM's concealment of the true quality of the Z06's "track-proven" powertrain systems. Had Plaintiff and the other Pennsylvania Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiff and the other Pennsylvania Class members who purchased a Z06 would have paid less for their Z06s or would not have purchased them at all.

657.   Plaintiff has been deprived of the benefit of his bargain and the value of Plaintiff's and the other Pennsylvania Class members' Z06s has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the Z06s.

658.   Accordingly, GM is liable to Plaintiff and the other Pennsylvania Class members for damages in an amount to be proven at trial.

659.   GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the

- 178 -

other Pennsylvania Class members' rights and the representations that GM made to them, in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FORTY-FIVE

### BREACH OF EXPRESS WARRANTY
### (13 PA. CONS. STAT. § 2313)

660.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

661.    Plaintiff brings this claim on behalf of the Pennsylvania Class.

662.    Plaintiff was at all relevant times a "buyer" as defined by § 2-103.

663.    GM was at all relevant times a "seller" as defined by § 2-103.

664.    The Z06s are and were at all relevant times "goods" as defined by § 2-105.

665.    As an express warrantor and manufacturer and merchant, GM had certain obligations under 13 PA. CONS. STAT. § 2313 to conform the Z06s to the express warranties.

666.    When Plaintiff and the other Class members purchased or leased their Z06s, GM expressly warranted in writing that the Z06s were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. GM

expressly warranted that at "no charge" it will repair "any vehicle defect." GM

breached its warranty obligations by selling inherently defective Z06s.

667.   The defects at issue in this litigation were present at the time of sale

and lease to Plaintiff and members of the Class.

668.   GM breached the Limited Warranty to repair and adjust, or to correct

defects in the design, materials and workmanship of, any part supplied by GM as

GM has been unable to repair or adjust the Z06's design, materials and

workmanship defects.

669.   Furthermore, the Limited Warranty of repair and/or adjustments to

effective parts fails in its essential purpose because the contractual remedy is

insufficient to make the Plaintiff and the other Class members whole and because

GM has failed and/or has refused to adequately provide the promised remedies

within a reasonable time.

670.   Pursuant to the express warranties, GM was obligated to pay for or

reimburse Plaintiff and the other Class members for costs incurred in purchasing

aftermarket coolers for the transmission and differential systems and other costs

associated with bringing their Z06s to the dealership for futile repair efforts. GM

was also obligated to repair the defects.

671.   Accordingly, recovery by Plaintiff and the other Class members is not

limited to the Limited Warranty of repair or adjustments to parts defective in

materials or workmanship, and Plaintiff and the other Class members seek all remedies as allowed by law.

672.   Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiff and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

673.   GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

674.   Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to the GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

675.   GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or

- 181 -

lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received, on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

676.   Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

677.   Plaintiff has had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiff and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

678.   As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

- 182 -

## COUNT FORTY-SIX

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (13 PA. CONS. STAT. §§ 2314 AND 2A212)

679.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

680.   Plaintiff brings this Count on behalf of the Pennsylvania Class.

681.   GM was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

682.   The Z06s are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

683.   A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212.

684.   These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety,

010687-11 1014581 V1

reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

685.   GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

686.   GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiff's counsel as referenced elsewhere in the Complaint, and by numerous individual letters and communications sent by Plaintiff and other Pennsylvania Class members before or within a reasonable amount of time.

687.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Pennsylvania Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## COUNT FORTY-SEVEN

### UNJUST ENRICHMENT
### (BASED ON PENNSYLVANIA LAW)

688.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

689.   Plaintiff brings this claim on behalf of the Pennsylvania Class.

690.   GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein.

- 184 -

GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Pennsylvania Class members.

691.    GM has voluntarily accepted and retained this benefit.

692.    The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Pennsylvania Class members.

693.    Plaintiff and the other Pennsylvania Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**K.    Claims Brought on Behalf of the South Carolina Class by Plaintiff Herold**

### COUNT FORTY-EIGHT

**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**
**(S.C. CODE ANN. § 39-5-10 *ET SEQ.*)**

694.    Plaintiff Herold for all South Carolina state claims ("Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

695.    This claim is brought by Plaintiff on behalf of the South Carolina Class.

696.    The South Carolina Unfair Trade Practices Act (South Carolina UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. CODE ANN. § 39-5-20(a).

697.    Defendant is a "person" under S.C. CODE ANN. § 39-5-10.

698.    Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiff and Class members seek monetary relief to recover their economic losses. Because Defendant's actions were willful and knowing, Plaintiff's damages should be trebled.

699.    Plaintiff also seeks punitive damages against Defendant because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff to cruel and unjust hardship as a result. Defendant intentionally and willfully misrepresented the safety and reliability of Corvette Z06s, deceived Plaintiff on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a dangerous flaw in the Z06s it repeatedly promised Plaintiff were safe. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

700.    Plaintiff further seeks an order enjoining Defendant's unfair or deceptive acts or practices.

- 186 -

## COUNT FORTY-NINE

## FRAUDULENT CONCEALMENT
### (BASED ON SOUTH CAROLINA LAW)

701.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

702.   Plaintiff brings this claim on behalf of the South Carolina Class.

703.   GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately 15 minutes, creating a dangerous hazard not only to the drivers but also to nearby racing Z06s. GM concealed the fact that the only way for the Z06s to become "track-proven" as advertised was for GM owners to buy rear differential and transmission coolers for their 2016 model year cars—at their own expense and potentially in violation of their express warranties.

704.   GM further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Z06s it was selling had no significant defects and that all Z06s were "track-proven."

705.   GM knew about the defects in the "track-proven" powertrain system when these representations were made.

- 187 -

706.   The Z06s purchased by Plaintiff and the other South Carolina Class members contained a defective "track-proven" powertrain system.

707.   GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other South Carolina Class members relied on GM's material representations.

708.   As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that South Carolina Class members would be required to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

709.   The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiff and the other South Carolina Class members did not know of these facts and GM actively concealed these facts from Plaintiff and the other South Carolina Class members.

- 188 -

710.   Plaintiff and the other South Carolina Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other South Carolina Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiff and the other South Carolina Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

711.   GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the Z06s and forced South Carolina Class members to make additional expenditures to ensure proper safety at the race track.

712.   GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiff or South Carolina Class members.

713.   GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the

Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

714.   GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiff and the other South Carolina Class members.

715.   GM has still not made full and adequate disclosures and continues to defraud Plaintiff and the other South Carolina Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

716.   Plaintiff and the other South Carolina Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other South Carolina Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or South Carolina Class members.

717.   Because of the concealment and/or suppression of facts, Plaintiff and the other South Carolina Class members sustained damage because they own(ed) Z06s that are diminished in value as a result of GM's concealment of the true quality of the Z06's "track-proven" powertrain systems. Had Plaintiff and the other South Carolina Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiff and the other South Carolina Class members who purchased a Z06 would have paid less for their Z06s or would not have purchased them at all.

718.   Plaintiff has been deprived of the benefit of his bargain and the value of Plaintiff's and the other South Carolina Class members' Z06s has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the Z06s.

719.   Accordingly, GM is liable to Plaintiff and the other South Carolina Class members for damages in an amount to be proven at trial.

720.   GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other South Carolina Class members' rights and the representations that GM made to them, in order to enrich GM. GM's conduct warrants an assessment of punitive

- 191 -

damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FIFTY

### BREACH OF EXPRESS WARRANTY
### (S.C. CODE ANN. §§ 36-2-313 AND 36-2A-210)

721.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

722.   Plaintiff brings this claim on behalf of the South Carolina Class.

723.   GM was at all relevant times a "merchant" with respect to motor vehicles under S.C. CODE ANN. §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

724.   The Z06s are and were at all relevant times "goods" within the meaning of S.C. CODE ANN. §§ 36-2-105(1) and 36-2A-103(1)(h).

725.   As an express warrantor and manufacturer and merchant, GM had certain obligations to conform the Z06s to the express warranties.

726.   When Plaintiff and the other Class members purchased or leased their Z06s, GM expressly warranted in writing that the Z06s were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain. GM expressly warranted that at "no charge" it will repair "any vehicle defect." GM breached its warranty obligations by selling inherently defective Z06s.

- 192 -

727. The defects at issue in this litigation were present at the time of sale and lease to Plaintiff and members of the Class.

728. GM breached the Limited Warranty to repair and adjust, or to correct defects in the design, materials and workmanship of, any part supplied by GM as GM has been unable to repair or adjust the Z06's design, materials and workmanship defects.

729. Furthermore, the Limited Warranty of repair and/or adjustments to effective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

730. Pursuant to the express warranties, GM was obligated to pay for or reimburse Plaintiff and the other Class members for costs incurred in purchasing aftermarket coolers for the transmission and differential systems and other costs associated with bringing their Z06s to the dealership for futile repair efforts. GM was also obligated to repair the defects.

731. Accordingly, recovery by Plaintiff and the other Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Class members seek all remedies as allowed by law.

- 193 -

732.   Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiff and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

733.   GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

734.   Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to the GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

735.   GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received,

- 194 -

on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

736.   Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

737.   Plaintiff has had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiff and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

738.   As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

- 195 -

## COUNT FIFTY-ONE

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (S.C. CODE §§ 36-2-314 AND 36-2A-212)

739.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

740.   Plaintiff brings this Count on behalf of the South Carolina Class.

741.   GM was at all relevant times a "merchant" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and a "seller" of motor vehicles under § 36-2-103(1)(d).

742.   The Z06s are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

743.   A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

744.   These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety,

- 196 -

reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

745.   GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

746.   GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiff's counsel as referenced elsewhere in the Complaint, and by numerous individual letters and communications sent by Plaintiff and other South Carolina Class members before or within a reasonable amount of time.

747.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other South Carolina Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## COUNT FIFTY-TWO

### UNJUST ENRICHMENT
### (BASED ON SOUTH CAROLINA LAW)

748.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

749.   This claim is brought by Plaintiff on behalf the South Carolina Class.

- 197 -

750.   GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein. GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Class members.

751.   GM has voluntarily accepted and retained this benefit.

752.   The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Class members.

753.   Plaintiff and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**L.    Claims Brought on Behalf of the Texas Class by Plaintiff Blanks**

**COUNT FIFTY-THREE**

**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE ANN. ANN. § 17.4 ET SEQ.)**

754.   Plaintiff Blanks for all Texas state law claims ("Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

755.   Plaintiff intends to assert a claim under the Texas Deceptive Trade Practices Act ("TDTPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM. CODE ANN. ANN. § 17.46. Plaintiff will make a demand in satisfaction of

- 198 -

TEX. BUS. & COM. CODE ANN. § 17.45(2), and may amend this Complaint to assert

claims under the TDTPA once the required 60 days have elapsed. This paragraph

is included for purposes of notice only and is not intended to actually assert a claim

under the TDTPA. A statutory notice letter was sent to GM on February 14, 2018.

## COUNT FIFTY-FOUR

### FRAUD BY CONCEALMENT
### (BASED ON TEXAS LAW)

756.   Plaintiff incorporates by reference all preceding allegations as though

fully set forth herein.

757.   Plaintiff brings this claim on behalf of the Texas Class.

758.   GM intentionally concealed that the defects contained in the "track-

proven" powertrain system render Z06s unfit for track use, in that the

transmissions of these vehicles would overheat when placed under track conditions

and unexpectedly go into Limp Mode after less than 15 minutes, creating a

dangerous hazard not only to the drivers, but also to nearby racing vehicles. GM

concealed the fact that the only way for the Z06s to become "track-proven" as

advertised was for GM owners to buy rear differential and transmission coolers for

their 2016 model year cars—at their own expense and potentially in violation of

their express warranties.

759.   GM further affirmatively misrepresented to Plaintiff in advertising

and other forms of communication, including standard and uniform material

provided with each car and on its website, that the Z06 it was selling had no significant defects, and that all Z06s were "track-proven."

760.    GM knew about the defects in the "track-proven" powertrain system when these representations were made.

761.    The Z06s purchased by Plaintiff and the other Class members contained a defective "track-proven" powertrain system.

762.    GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiff and the other Class members relied on GM's material representations.

763.    As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defect and that Plaintiff and other Class members would be required to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

764.    The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiff and the other Class members did not know of these

facts and GM actively concealed these facts from Plaintiff and the other Class members.

765.   Plaintiff and the other Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiff and the other Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

766.   GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the vehicles and forced Plaintiff and the other Class members to make additional expenditures to ensure proper safety at the race track.

767.   GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiff or the other Class members.

768.   GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the

Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the vehicle.

769.   GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiff and the other Class members.

770.   GM has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

771.   Plaintiff and the other Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiff, or other Class members.

772.   Because of the concealment and/or suppression of facts, Plaintiff and the other Class members sustained damage because they own(ed) vehicles that are

- 202 -

diminished in value as a result of GM's concealment of the true quality of those vehicles' "track-proven" powertrain systems. Had Plaintiff and the other Class members been aware of the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's disregard for the truth, Plaintiff and the other Class members who purchased a Z06 would have paid less for their vehicles or would not have purchased them at all.

773. The value of Plaintiff's and the other Class members' vehicles has diminished as a result of GM's fraudulent concealment of the defective "track-proven" powertrain system of the Z06s, which has made any reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would have been fair market value for the vehicles.

774. Accordingly, GM is liable to Plaintiff and the other Class members for damages in an amount to be proven at trial.

775. GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and other Class members' rights and the representations that GM made to them, in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FIFTY-FIVE

## BREACH OF EXPRESS WARRANTY
### (TEX. BUS & COM. CODE ANN. §2-313)

776.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

777.    Plaintiff brings this claim on behalf of the Texas Class.

778.    Plaintiff was at all relevant times a "buyer" as defined by TEX. BUS. & COM. CODE ANN. § 1-201(9).

779.    GM was at all relevant times a "merchant" as defined by TEX. BUS. & COM. CODE ANN. § 2-104.

780.    The Z06s are and were at all relevant times "goods" as defined by TEX. BUS. & COM. CODE ANN. § 2105.

781.    As an express warrantor and manufacturer and merchant, GM had certain obligations under TEX. BUS. & COM. CODE ANN. § 2-313 to conform the Z06s to the express warranties.

782.    When Plaintiff and the other Class members purchased or leased their Z06s, GM expressly warranted in writing that the Z06s were covered by a Limited Warranty and that the Limited Warranty formed the basis of the bargain.

783.    The defects at issue in this litigation were present at the time of sale and lease to Plaintiff and members of the Class.

- 204 -

784.   GM breached the Limited Warranty to repair and adjust, or to correct defects in the design, materials and workmanship of, any part supplied by GM as GM has been unable to repair or adjust the Z06's design, materials and workmanship defects.

785.   Furthermore, the Limited Warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

786.   Pursuant to the express warranties, GM was obligated to pay for or reimburse Plaintiff and the other Class members for costs incurred in purchasing aftermarket coolers for the transmission and differential systems and other costs associated with bringing their Z06s to the dealership for futile repair efforts. GM was also obligated to repair the defects.

787.   Accordingly, recovery by the Plaintiff and the other Class members is not limited to the Limited Warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff and the other Class members seek all remedies as allowed by law.

788.   Also, as alleged in more detail herein, at the time that GM warranted and sold the Z06s, and while knowing that the Z06s did not conform to GM's

- 205 -

Limited Warranty and were inherently defective, GM wrongfully and fraudulently concealed material facts regarding the Z06s. Plaintiff and the other Class members were therefore induced to purchase the Z06s under false and/or fraudulent pretenses.

789.   GM and its agent dealers have failed and refused to conform the Z06s to the express warranties and GM's conduct, and have voided any attempt on GM's part to disclaim liability for its actions.

790.   Moreover, many of the damages flowing from the Z06s cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to the GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

791.   GM received timely notice regarding the problems at issue in this litigation (indeed, GM knew of the defects prior to offering the Z06s for sale or lease). GM was also provided notice of these issues through the receipt of numerous complaints regarding the Limp Mode manifestations. GM has received, on information and belief, many complaints from Class members advising them of the defects at issue in this litigation.

- 206 -

792.    Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of GM or by operation of law in light of GM's unconscionable conduct.

793.    Plaintiff has had sufficient dealings with either GM or its agents (dealerships and/or GM Performance) to establish privity of contract. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's express warranties and these warranties were advertised to Plaintiff and the other Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

794.    As a direct and proximate result of GM's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value.

### COUNT FIFTY-SIX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (TEX. BUS. & COM. CODE §§ 2.314 AND 2A.212)

795.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

- 207 -

796.   Plaintiff brings this Count on behalf of the Texas Class.

797.   GM was at all relevant times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

798.   The Z06s are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

799.   A warranty that the Z06s were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

800.   These Z06s, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Z06s are inherently defective in that the defects in the Z06s' "track-proven" powertrain system leads to overheating of the powertrain system and causes vehicles to go unexpectedly into Limp Mode while driving on public roadways. The Limp Mode manifestation substantially impairs the safety, reliability, and operability of the Z06s to the extent it renders them unfit for their ordinary purpose of driving on public roadways.

801.   GM knew about the Z06 "track-proven" powertrain defects at the time of purchase, allowing it to cure their breach of warranty if it chose.

- 208 -

802.   GM was provided notice of these issues by numerous complaints filed against it, by the notice letter sent by Plaintiff's counsel as referenced elsewhere in the Complaint, and by numerous individual letters and communications sent by Plaintiff and other Texas Class members before or within a reasonable amount of time.

803.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the other Texas Class members have been damaged in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

## COUNT FIFTY-SEVEN

### UNJUST ENRICHMENT
### (BASED ON TEXAS LAW)

804.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

805.   Plaintiff brings this claim on behalf of the Texas Class.

806.   GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein. GM has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Class members.

807.   GM has voluntarily accepted and retained this benefit.

- 209 -

808.   The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Class members.

809.   Plaintiff and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide and State Classes, respectfully request that the Court enter judgment in their favor and against General Motors, as follows:

A.     Certification of the proposed Nationwide Class and State Law Classes, including appointment of Plaintiffs' counsel as Class Counsel;

B.     An order temporarily and permanently enjoining General Motors from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     Injunctive relief in the form of a recall or free replacement program;

D.     Injunctive relief in the form of a buy-back;

E.     Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

- 210 -

F.      An order requiring General Motors to pay both pre- and post-judgment interest on any amounts awarded;

G.      An award of costs and attorneys' fees; and

H.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

- 211 -

Dated: February 20, 2018         HAGENS BERMAN SOBOL SHAPIRO LLO

By: */s/ Steve W. Berman*
    Steve W. Berman
Shelby Smith (*pro hac vice* admission pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: shelbys@hbsslaw.com

E. Powell Miller (P39487)
THE MILLER LAW FIRM, P.C.
950 West University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com

Stuart Z. Grossman
Rachel Furst
2525 Ponce de Leon, Suite 1150
Coral Gables, FL 33134
Telephone: (888) 296-1681
Facsimile: (305) 285-1668
Email: szg@grossmanroth.com
Email: rwf@grossmanroth.com

Jason D. Weisser
SCHULER, HALVORSEN, WEISSER,
ZOLLER, OVERBECK
1615 Forum Place, Suite 4
West Palm Beach, FL 33401
Telephone: (561) 689-9180

*Attorneys for Plaintiffs and the Proposed Class*